

FRANCIS J. DEASEY
HARRY G. MAHONEY
GERALD J. VALENTINI‡
HENRI MARCEL†
JOHN P. MORGENSTERN†
ANDREW B. ADAIR
KEVIN M. DURKAN†
MATTHEW J. JUNK†
ATHENA O. PAPPAS†
RUFUS A. JENNINGS◊

LAUREN M. STEINS†
TUDOR I. FARCAS
LEANNA B. RUOTANEN†□
CHARLES E. WILLIAMS†
CAROLYN A. WILLIAMS†
ARMAND C. PACE, JR.
STEVEN K. DILIBERTO
BRIAN M. PÉREZ‡‡

† ALSO MEMBER NJ BAR
‡ ALSO MEMBER CA BAR
◊ ALSO MEMBER NY BAR
□ ALSO MEMBER GA BAR
◊ ALSO MEMBER DE BAR

OF COUNSEL:

FRANK C. BENDER
MICHAEL P. RAUSCH†
WILLIAM A. RUBERT†
GEORGE R. ZACHARKOW†
WARD A. RIVERS†
CHRISTOPHER C. NEGRETE
PENELOPE B. O'CONNELL†◊

NEW JERSEY OFFICE
923 HADDONFIELD ROAD, SUITE 300
CHERRY HILL, NJ 08002
856-429-6331
FACSIMILE: 856-429-6562

MEDIA OFFICE
SUITE 101
103 CHESLEY DRIVE
MEDIA, PA 19063
610-892-2732
FACSIMILE: 215-587-9456

SUITE 3400
1601 MARKET STREET
PHILADELPHIA, PA 19103-2301
215-587-9400
FACSIMILE: 215-587-9456
WWW.DMVLAWFIRM.COM

DIRECT EMAIL: SDILIBERTO@DMVLAWFIRM.COM
VOICE-MAIL EXTENSION #1133

VIA COURIER
June 14, 2018

United States District Court
for the Eastern District of Pennsylvania
601 Market Street, Room 2609
Philadelphia, PA 19107

      **Re:**    **Admiral Insurance Co., v Liberty Mutual Fire Ins. Co., et al**
              **USDC – EDPa**
              **Our File No. 411.26342**

Dear Sir/Madam:

      Enclosed for filing is a Complaint for Declaratory Judgment, and attendant documents. In that regard, the following documents are being provided in hard copy and as PDF files on the enclosed CD:

           1.    Complaint
           2.    Civil Cover Sheet;
           3.    Designation Form (2 copies)
           4.    Case Management Form
           5.    Disclosure Statement Form;

      Would you kindly file the documents of record and stamp and return copies as proof of filing.

      Also provided is my firm's check no. 99989 payable to Clerk, United States District Court in the amount of $400.00 for the requisite initial filing fees. Should you have any

PAGE NO.     2          Clerk, United States District Court, Eastern District of Pennsylvania

questions please contact the undersigned.

Very truly yours,

DEASEY, MAHONEY & VALENTINI, LTD.

Steven K. DiLiberto, Esquire

SKD/pel
Enc.

JS 44 (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a) PLAINTIFFS**
Admiral Insurance Co., et al

**DEFENDANTS**
Liberty Mutual Fire Ins. Co., et al

**(b)** County of Residence of First Listed Plaintiff   Maricopa Co., Arizona
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Suffolk Co., MA
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Steven K. DiLiberto, Esquire, Harry Mahoney, Esquire and Ward Rivers, Esquire,  Deasey, Mahoney & Valentini, Ltd., 1601 Market Street, Suite 3400, Phila., PA 19103

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1  U.S. Government
Plaintiff

☐ 3  Federal Question
*(U.S. Government Not a Party)*

☐ 2  U.S. Government
Defendant

☒ 4  Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                          *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☒ 2 | Incorporated *and* Principal Place of Business In Another State | ☒ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☒ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☐ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Product Liability | | 28 USC 157 | 3729(a)) |
| ☐ 140 Negotiable Instrument | Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| & Enforcement of Judgment | Slander | Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted | Liability | ☐ 368 Asbestos Personal | | ☐ 835 Patent - Abbreviated | ☐ 460 Deportation |
| Student Loans | ☐ 340 Marine | Injury Product | | New Drug Application | ☐ 470 Racketeer Influenced and |
| (Excludes Veterans) | ☐ 345 Marine Product | Liability | | ☐ 840 Trademark | Corrupt Organizations |
| ☐ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending | Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ |
| ☐ 190 Other Contract | Product Liability | ☐ 380 Other Personal | ☐ 720 Labor/Management | ☐ 863 DIWC/DIWW (405(g)) | Exchange |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Property Damage | Relations | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| | ☐ 362 Personal Injury - | Product Liability | ☐ 751 Family and Medical | | ☐ 893 Environmental Matters |
| | Medical Malpractice | | Leave Act | | ☐ 895 Freedom of Information |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement | ☐ 870 Taxes (U.S. Plaintiff | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | Income Security Act | or Defendant) | ☐ 899 Administrative Procedure |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate | | ☐ 871 IRS—Third Party | Act/Review or Appeal of |
| ☐ 240 Torts to Land | ☐ 443 Housing/ | Sentence | | 26 USC 7609 | Agency Decision |
| ☐ 245 Tort Product Liability | Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** | | State Statutes |
| | Employment | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 446 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | |
| | Other | ☐ 550 Civil Rights | Actions | | |
| | ☐ 448 Education | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from Another District *(specify)*
☐ 6 Multidistrict Litigation - Transfer
☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 USC 2201 and 2202 and 23 USC 1332

Brief description of cause:
Declaratory Judgment relief sought regarding duties owed under insurance policy

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☐ Yes  ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____   DOCKET NUMBER _____

DATE
06/14/2018

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

JS 44 Reverse  (Rev. 06/17)

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)** **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)** **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)** **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.** **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.** **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553  Brief Description: Unauthorized reception of cable service

**VII.** **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### CASE MANAGEMENT TRACK DESIGNATION FORM

| | | |
|---|---|---|
| Admiral Ins. Co., et al | : | CIVIL ACTION |
| v. | : | |
| Liberty Mutual Fire Inc. Co. | : | NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.)  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

### SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.                           (  )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
    and Human Services denying plaintiff Social Security Benefits.                                      (  )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.   (  )

(d) Asbestos – Cases involving claims for personal injury or property damage from
    exposure to asbestos.                                                                                              (  )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
    commonly referred to as complex and that need special or intense management by
    the court.  (See reverse side of this form for a detailed explanation of special
    management cases.)                                                                                                 (  )

(f) Standard Management – Cases that do not fall into any one of the other tracks.              ( x )

| | | |
|---|---|---|
| 6/14/18 | Steven DiLiberto | Admiral Ins. Co., et al |
| **Date** 215 587 9400 | 215 587 9456 **Attorney-at-law** | **Attorney for** |
| | | sdiliberto@dmvlawfirm.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

## UNITED STATES DISTRICT COURT

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA — DESIGNATION FORM** to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.

Address of Plaintiff: _7233 E. Butherus Dr., Scottsdale, AZ  85260_

Address of Defendant: _175 BERKELEY Street, BOSTON,MA  02116_

Place of Accident, Incident or Transaction: _Philadelphia, PA_
<br>(*Use Reverse Side For Additional Space*)

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?
(Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a))    Yes☒ No☐

Does this case involve multidistrict litigation possibilities?    Yes☐ No☒
*RELATED CASE, IF ANY:*
Case Number: _____ Judge _____ Date Terminated: _____

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?    Yes☐ No☒

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?    Yes☐ No☒

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?    Yes☐ No☒

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?    Yes☐ No☒

CIVIL: (Place ✔ **in** ONE CATEGORY ONLY)

A. *Federal Question Cases:*

1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☐ Antitrust
5. ☐ Patent
6. ☐ Labor-Management Relations
7. ☐ Civil Rights
8. ☐ Habeas Corpus
9. ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ☐ All other Federal Question Cases
(Please specify) _____

B. *Diversity Jurisdiction Cases:*

1. ☒ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury (Please specify)
7. ☐ Products Liability
8. ☐ Products Liability — Asbestos
9. ☐ All other Diversity Cases
(Please specify) _____

## ARBITRATION CERTIFICATION
*(Check Appropriate Category)*

I, _Steven DiLiberto_, counsel of record do hereby certify:

☐ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;

☒ Relief other than monetary damages is sought.

DATE: _6/14/18_    _Steven DiLiberto_    _82594_
<br>Attorney-at-Law    Attorney I.D.#

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: _6/14/18_    _Steven DiLiberto_    _82594_
<br>Attorney-at-Law    Attorney I.D.#

CIV. 609 (5/2012)

# UNITED STATES DISTRICT COURT

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA — DESIGNATION FORM** to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.

Address of Plaintiff: _7233 E. Butherus Dr., Scottsdale, AZ  85260_

Address of Defendant: _175 BERKELEY Street, BOSTON,MA  02116_

Place of Accident, Incident or Transaction: _Philadelphia,  PA_
(Use Reverse Side For Additional Space)

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?
(Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a))        Yes ☒  No ☐

Does this case involve multidistrict litigation possibilities?        Yes ☐  No ☒

*RELATED CASE, IF ANY:*

Case Number: _____   Judge _____   Date Terminated: _____

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?        Yes ☐  No ☒

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?        Yes ☐  No ☒

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?        Yes ☐  No ☒

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?        Yes ☐  No ☒

CIVIL: (Place ✔ in ONE CATEGORY ONLY)

A. *Federal Question Cases:*

1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☐ Antitrust
5. ☐ Patent
6. ☐ Labor-Management Relations
7. ☐ Civil Rights
8. ☐ Habeas Corpus
9. ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ☐ All other Federal Question Cases
   (Please specify) _____

B. *Diversity Jurisdiction Cases:*

1. ☒ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury (Please specify)
7. ☐ Products Liability
8. ☐ Products Liability — Asbestos
9. ☐ All other Diversity Cases
   (Please specify) _____

# ARBITRATION CERTIFICATION
*(Check Appropriate Category)*

I, _Steven DiLiberto_, counsel of record do hereby certify:

☐ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;

☒ Relief other than monetary damages is sought.

DATE: _6/14/18_     _Steven DiLiberto_          _82594_
                     Attorney-at-Law            Attorney I.D.#

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: _6/14/18_     _Steven DiLiberto_          _82594_
                     Attorney-at-Law            Attorney I.D.#

CIV. 609 (5/2012)

**APPENDIX G**

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

Admiral Insurance Co., et al                      :
                                                  :
                                                  :
                    V.                            :                    Civil Action
                                                  :                    No: _____
Liberty Mutual Fire Ins. Co., etal                :
                                                  :

### DISCLOSURE STATEMENT FORM

Please check one box:

☐          The nongovernmental corporate party, _____
           , in the above listed civil action does not have any parent corporation and
           publicly held corporation that owns 10% or more of its stock.

☑          The nongovernmental corporate party,    Admiral Insurance Company
           , in the above listed civil action has the following parent corporation(s) and
           publicly held corporation(s) that owns 10% or more of its stock:

W. R. Berkley Corporation _____

_____

_____

_____

6/14/18 _____        _____
Date                                                   Signature

                    Counsel for:    Plaintiff, Admiral Ins. Co.

## Federal Rule of Civil Procedure 7.1 Disclosure Statement

(a)   WHO MUST FILE; CONTENTS.  A nongovernmental corporate party must file
      two copies of a disclosure statement that:
      (1)   identifies any parent corporation and any publicly held corporation
            owning10% or more of its stock;  or

      (2)   states that there is no such corporation.

(b) TIME TO FILE; SUPPLEMENTAL FILING.  A party must:
      (1)   file the disclosure statement with its first appearance, pleading,
            petition, motion, response, or other request addressed to the court;
            and
      (2)   promptly file a supplemental statement if any required information
            changes.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### CASE MANAGEMENT TRACK DESIGNATION FORM

| | | |
|---|---|---|
| Admiral Ins. Co., et al | : | CIVIL ACTION |
| | : | |
| v. | : | |
| Liberty Mutual Fire Inc. Co. | : | NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

### SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.          ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health and Human Services denying plaintiff Social Security Benefits.          ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.     ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from exposure to asbestos.          ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are commonly referred to as complex and that need special or intense management by the court. (See reverse side of this form for a detailed explanation of special management cases.)          ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks.          (x)

| | | |
|---|---|---|
| 6/14/18 | Steven DiLiberto | Admiral Ins. Co., et al |
| Date    215 587 9400 | 215  587  9456  Attorney-at-law | **Attorney for** |
| | | sdiliberto@dmvlawfirm.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Clv. 660) 10/02

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ADMIRAL INSURANCE COMPANY, on its own behalf and as assignee of Girard Estate Fee and Girard Estate Leasehold,

      Plaintiff,

      v.

LIBERTY MUTUAL FIRE INSURANCE COMPANY and LIBERTY INSURANCE CORPORATION,

      Defendants.

Civil Action No.:

**COMPLAINT FOR DECLARATORY JUDGMENT**

Plaintiff, Admiral Insurance Company ("Admiral"), by and through its undersigned counsel, Deasey Mahoney & Valentini LTD., comes now before this Honorable Court and files this Complaint for Declaratory Judgment against Defendants, Liberty Mutual Fire Insurance Company and Liberty Insurance Corporation (collectively, "Liberty Mutual"), and in support thereof avers as follows:

### I.    NATURE OF THE ACTION

1.    This is an insurance coverage action seeking declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202. Admiral seeks a determination that Liberty Mutual has an obligation to provide $5,000,000 in coverage under an umbrella liability policy to Girard Estate Fee and Girard Estate Leasehold (collectively "Girard Estate") and Kennedy-Wilson Pennsylvania Management, Inc. ("KWPMI") as additional insureds on that policy with respect to claims

1

asserted against them in an underlying lawsuit filed by Timothy and Katharine May in the Philadelphia County Court of Common Pleas (the "*May* Lawsuit").

2.      Since November 2016, Liberty Mutual has been providing a defense and indemnification, without any reservation of rights, to Girard Estate and KWPMI as additional insureds under both a $1,000,000 primary liability policy and the above-referenced $5,000,000 umbrella policy. From that time through March 2018, Liberty Mutual represented that it was providing a combined $6,000,000 in insurance coverage to Girard Estate and KWPMI under the Liberty Mutual policies.

3.      In March 2018, Liberty Mutual advised for the first time that it would not provide the full $5,000,000 in limits under the umbrella policy to Girard Estate and KWPMI, but rather, the umbrella policy would only provide $1,000,000 in limits to Girard Estate and KWPMI pursuant to certain language in the Additional Insured Limitation LCU 20 01 10 10 endorsement attached to the umbrella policy.

4.      However, the language of the Additional Insured Limitation LCU 20 01 10 10 endorsement does not operate to reduce the umbrella policy limit from $5,000,000 to $1,000,000. But even if the language did apply, Liberty Mutual has waived, or should be estopped, or otherwise equitably precluded, from now attempting to reduce the $5,000,000 limit of the umbrella policy after having assumed complete control of the defense of Girard Estate and KWPMI for the last seventeen months, without reservation, and only raising the limits issue after a failed mediation with the *May* Lawsuit scheduled to go to trial in June, 2018.

5.      Girard Estate has assigned their rights to bring this action to Admiral.

## II.  THE PARTIES

6.     Admiral Insurance Company is an insurance company incorporated under the laws of the State of Delaware with corporate offices at 7233 E. Butherus Drive, Scottsdale, Arizona, 85260, and regularly conducts business within the Commonwealth of Pennsylvania and within this judicial district.

7.     Defendant, Liberty Mutual Fire Insurance Company, is an insurance company incorporated under the laws of Wisconsin with corporate offices at 175 Berkeley Street, Boston, Massachusetts, 02116, and regularly conducts business within the Commonwealth of Pennsylvania and within this judicial district.

8.     Defendant, Liberty Insurance Corporation, is an insurance company incorporated under the laws of Illinois with corporate offices at 175 Berkeley Street, Boston, Massachusetts, 02116, and regularly conducts business within the Commonwealth of Pennsylvania and within this judicial district.

## III.  JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction over this action for declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure.

10.    A justiciable controversy exits between Admiral and Liberty Mutual within the meaning of 28 U.S.C. § 2201 with respect to the applicable limit available to Girard Estate and KWPMI under the Liberty Mutual umbrella policy with regard to the claims asserted against them in the *May* Lawsuit, as described more fully below. See, e.g., ACandS, Inc. v. Aetna Casualty & Surety Co., 666 F.2d 819, 822-23 (3d Cir. 1981); Yellowbird Bus Co. v. Lexington Ins. Co., 2010 U.S. Dist. LEXIS 69554 (E.D. Pa. 2010) ("in the context of a declaratory

judgment action, courts generally find that the issue of whether an insurer has a duty to defend an insured in an underlying action is sufficiently ripe" for judicial determination).

11.     This Court has diversity jurisdiction pursuant to 23 U.S.C. § 1332(a)(1) because the amount in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and the suit is between citizens of different states.

12.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 in that a substantial part of the events or omissions giving rise to this claim occurred in this judicial district, the additional insureds Girard Estate and KWPMI are located in this judicial district, and both Admiral and Liberty Mutual do business in this judicial district.

## IV.     FACTS GIVING RISE TO THE INSURANCE COVERAGE DISPUTE

### The Underlying *May* Lawsuit

13.     On or about September 28, 2016, Timothy and Katharine May ("Plaintiffs") filed a complaint (the "Underlying Complaint") in the Philadelphia County Court of Common Pleas against Girard Estate and KWPMI (the "*May* Lawsuit"). A copy of the May Underlying Complaint is attached hereto as **"Exhibit A."**

14.     In the Complaint, Plaintiffs allege that Girard Estate and KWPMI owned maintained and/or controlled the premises located at 1101 Market Street, Philadelphia, PA, known as the "Aramark Tower." Id. at ¶ 5.

15.     Plaintiffs further allege that on May 5, 2015, Timothy May was injured at the Aramark Tower when an exterior door on the 33rd floor blew shut behind him, striking him and causing him to hit his head on a low-hanging concrete soffit in front of him. Plaintiffs allege that the door was defective and that Girard Estate and KWPMI were negligent in failing to inspect and maintain the door, in addition to other alleged acts of negligence. Id. at ¶¶ 6-7, 10.

16.     Plaintiffs allege that as a result of this accident, Timothy May suffered significant neck injuries, spinal cord injuries, concussion, and post concussive syndrome, resulting in two surgeries. The first surgery allegedly consisted of discectomies at C4-5 and C6-7, decompression of the spinal cord and nerve roots, fusion at C4-5 and C6-7, bone grafts and the insertion of cervical plates.  The second surgery allegedly consisted of posterior cervical laminectomies, foraminotomies and lateral mass instrumented fixation/fusion from C3 through C7. Id. at ¶ 12.

17.     Plaintiffs further allege that as a result of this accident, Timothy May can no longer work. Id. at ¶ 16.

### The Girard Estate/KWPMI – Farrelly Maintenance Contract

18.     At the time of accident, Timothy May was employed as an engineer's helper by Farrelly Building Services, Inc. ("Farrelly"), which was providing engineering and related maintenance services at the Aramark Tower for Girard Estate and KWPMI pursuant to an Agreement for Engineering Services into between KWPMI (on behalf of Girard Estate) and Farrelly (the "Agreement"). A copy of the Agreement for Engineering Services is attached hereto as **"Exhibit B."**

19.     The Agreement contains, among other things, an indemnification clause, which broadly requires Farrelly to defend and indemnify Girard Estate and KWPMI for claims arising out of Farrelly's performance of the Agreement. Id. at Article IV.

20.     The Agreement also contains a requirement that Farrelly obtain "[c]omprehensive general liability insurance including bodily injury, property damage, contractual liability and automobile liability … in an amount of not less than $2,000,000 combined single limit."  Id. at Para. 4.1.b.

21.     The Agreement further requires Farrelly to name Girard Estate and KWPMI as additional insureds on its primary and excess liability policies, with those policies to be primary and non-contributory with any other insurance maintained by Girard Estate and KWPMI. Id.

22.     On July 31, 2014, a Certificate of Insurance was issued that identifies Girard Estate and KWPMI as additional insureds on two of Farrelly's  policies: (1) a primary CGL policy issued by Liberty Mutual Fire Insurance Company bearing policy number TB2-Z91-455039-034 with an effective date of August 1, 2014, through August 1, 2015, with a limit of $1,000,000 per occurrence (the "Primary Policy"); and (2) an umbrella liability policy issued Liberty Insurance Company bearing policy number TH7-Z91-455039-044 with an effective date of August 1, 2014, through August 1, 2015, with a limit of $5,000,000 per occurrence (the "Umbrella Policy"). A copy of the Certificate of Insurance is attached hereto as **"Exhibit C."**

### The Liberty Mutual Primary and Umbrella Policies

23.     Liberty Mutual's Primary Policy was issued by Liberty Mutual Fire Insurance Company to Farrelly bearing policy number TB2-Z91-455039-034 with an effective date of August 1, 2014, through August 1, 2015, with a limit of $1,000,000 per occurrence. A copy of the Liberty Mutual Primary Policy is attached hereto as **"Exhibit D."**

24.     The Primary Policy contains a Blanket Additional Insured endorsement in the Commercial General Liability Enhancement For Janitorial Enhancement LC 04 44 04 12 endorsement (Item 10), that operates to afford additional insured coverage to Girard Estate and KWPMI for the *May* Lawsuit. Id.

25.     The Primary Policy also contains an Other Insurance Amendment in the Commercial General Liability Enhancement For Janitorial Enhancement LC 04 44 04 12

endorsement (Item 13), that makes the Primary Policy apply on a primary and non-contributory insurance basis for Girard Estate and KWPMI for the *May* Lawsuit. Id.

26.     Liberty Mutual's Umbrella Policy was issued by Liberty Insurance Company to Farrelly bearing policy number TH7-Z91-455039-044 with an effective date of August 1, 2014, through August 1, 2015, with a limit of $5,000,000 per occurrence. A copy of the Liberty Mutual Umbrella Policy is attached hereto as **"Exhibit E."**

27.     The Umbrella Policy, which specifically states it is excess over the Primary Policy, contains the Additional Insured Limitation LCU 20 01 10 10 endorsement that modifies the Umbrella Policy's "Who Is An Insured" provision to name as an additional insured on the Policy any entity that is an additional insured on the underlying Liberty Mutual Primary Policy, which includes both Girard Estate and KWPMI for purposes of the *May* Lawsuit. Id.

28.     The Additional Insured Limitation LCU 20 01 10 10 endorsement further states that the Umbrella Policy's limit is limited to the "minimum amount of insurance … [r]equired by the contract or agreement …" Id.

29.     The applicable contract is the Agreement between KWPMI and Farrelly that merely provides for a floor of required insurance to be provided by Farrelly; however, the Agreement does not preclude Farrelly from purchasing higher limits of coverage, which it apparently chose to do in this case, as evidenced by the Certificate of Insurance dated July 31, 2014, that plainly indicated that Farrelly had procured the $1,000,000 Primary Policy and the $5,000,000 Umbrella Policy to satisfy its insurance requirements under the Agreement. Id.

7

**Liberty Mutual Defends Girard Estate and KWPMI Without Reservation
For Seventeen Months**

30.     At the time of the accident, Girard Estate was the named insured on a commercial general liability policy issued by Admiral bearing policy number CA000003056-23, effective March 28, 2015, through March 28, 2016, providing a $1,000,000 per occurrence limit (the "Admiral Policy").

31.     Admiral, as the liability insurer for Girard Estate, was put on notice of the *May* Lawsuit.

32.     When Liberty Mutual did not immediately respond, Admiral engaged counsel to defend the interests of Girard Estate and KWPMI in the *May* Lawsuit, and to re-tender their defense to Farrelly and Liberty Mutual.

33.     Admiral, directly and through other parties, tendered the defense and indemnification of Girard Estate and KWPMI to Liberty Mutual under both the Primary Policy and Umbrella Policy issued by Liberty Mutual to Farrelly.  Such tenders were made both pre-suit and post-suit.

34.     Finally, on November 30, 2016, Liberty Mutual acknowledged its obligations owed to Girard Estate and KWPMI, accepted Admiral's tender, and agreed to provide a defense and indemnification to Girard Estate and KWPMI, as additional insureds on the Primary Policy and Umbrella Policy, on a primary and non-contributory basis without any reservation of rights.

35.     Immediately upon accepting Admiral's tender and agreeing to provide a defense and indemnification to Girard Estate and KWPMI in the *May* Lawsuit, Liberty Mutual transferred the defense of Girard Estate and KWPMI to Liberty Mutual's in-house staff counsel, Styliades, Messonote & Hasson.  Gary S. Williams, Esq., and William F. Sweeney, Esq., from that office represented Girard Estate and KWPMI in the *May* Lawsuit up through February 2018.

8

During the time Girard Estate and KWPMI were being defended by Liberty Mutual's in-house staff counsel, Liberty Mutual assumed total and complete control over the defense of Girard Estate and KWPMI.

36.     In February 2018, the defense of Girard Estate and KWPMI was transferred from the law firm of Styliades, Messonote & Hasson to another law firm, Cipriani & Werner, which continues to defend Girard Estate and KWPMI in the *May* Lawsuit.  During the time Girard Estate and KWPMI were being defended by Cipriani & Werner, Liberty Mutual assumed total and complete control over the defense of Girard Estate and KWPMI in the *May* Lawsuit.

37.     From the time of its acceptance of the tender in November 2016, through March 2018, Liberty Mutual continued to provide a defense and indemnification to Girard Estate and KWPMI in the *May* Lawsuit on a primary, non-contributory basis under both Primary Policy and Umbrella Policy without ever issuing a reservation of rights letter or providing any indication whatsoever that it was not intending to provide to Girard Estate and KWPMI the full $5,000,000 in limits under the Umbrella Policy.

## After A Failed Mediation And On The Eve Of Trial, Liberty Mutual Formally Informs Girard Estate And KWPMI That It Has $2,000,000, Not $6,000,000, In Coverage

38.     From November 2016, up through March 19, 2018, Liberty Mutual exclusively handled and controlled the defense and indemnification of Girard Estate and KWPMI as additional insureds under the Liberty Mutual Primary Policy and Umbrella Policy.

39.     On March 19, 2018, Liberty Mutual sent an email to Admiral advising that a mediation had been scheduled for the *May* Lawsuit on April 9, 2018, and attached a copy of defense counsel's latest evaluation of the *May* Lawsuit.  A copy of Liberty Mutual's March 19, 2018, email is attached hereto as **"Exhibit F."**

40.     In its March 19th email, Liberty Mutual also stated for the first time in writing that it was taking the position that although there was $1,000,000 in coverage under the Primary Policy, there was also only $1,000,000 in coverage under the Umbrella Policy instead of the full $5,000,000 in available limits that Girard Estate, KWPMI, and Admiral had been led to believe existed based on Liberty Mutual's providing a defense to Girard Estate and KWPMI for the past seventeen months without any reservation of rights. Id.

41.     Specifically, Liberty Mutual claimed in its email that Girard Estate and KWPMI were additional insureds on the Umbrella Policy by virtue of the Additional Insured Limitation LCU 20 01 10 10 endorsement, which provides among other things that the most Liberty Mutual would pay on behalf of an additional insured was the minimum amount of insurance required by either the underlying contract or the applicable limits of the Umbrella Policy.  The email further reads that the Agreement between KWPMI and Farrelly provides that Farrelly would procure liability insurance "in an amount of not less than $2,000,000 combined single limit." Thus, Liberty Mutual contended in its email that since the Primary Policy was providing $1,000,000 in coverage, the Umbrella Policy's applicable limit would be $1,000,000 to satisfy the $2,000,000 required by the Agreement. Id.

42.     On April 9, 2018, a nonbinding mediation was conducted in the *May* Lawsuit. Apparently, the Plaintiffs' settlement demand at that time was $9,450,000 which consisted of a demand of $7,950,000 for Timothy May and $1,500,000 for Katharine May. Liberty Mutual offered a total of $1,100,000 on behalf of Girard Estate and KWPMI to settle the case, with $1,000,000 being paid from the Primary Policy and $100,000 being paid from the Umbrella Policy.  Plaintiffs rejected Liberty Mutual's offer of $1,100,000.

43.     On April 16, 2018, Admiral received a letter from Liberty Mutual to Richard McClure of KWPMI (erroneously dated November 7, 2011) formally advising KWPMI for the first time in this litigation that the Umbrella Policy would not provide the full $5,000,000 limits, and instead, would only provide $1,000,000 in limits above the $1,000,000 in limits afforded by the Primary Policy. The letter went on to advise KWPMI that based on the Plaintiffs' demand of $9,450,000, and in addition to the drastically reduced limits of the Umbrella Policy from $5,000,000 to $1,000,000, KWPMI was substantially at risk for an excess verdict. Girard Estate was not carbon copied on the email, and it is uncertain whether Liberty Mutual ever formally advised Girard Estate of the drastic reduction in coverage under the Umbrella Policy or that it too was now substantially at risk for an excess verdict. A copy of Liberty Mutual's letter to Mr. McClure is attached hereto as **"Exhibit G."**

44.     On May 4, 2018, Admiral's counsel issued a letter to Liberty Mutual disputing Liberty Mutual's 11th hour attempt to reduce the applicable limits of the Umbrella Policy from $5,000,000 down to $1,000,000 for Girard Estate and KWPMI.  As explained in the letter, Admiral strenuously disagrees with Liberty Mutual's position that the language in the Additional Insured Limitation LCU 20 01 10 10 endorsement applies to reduce the limits of the Umbrella Policy from $5,000,000 to $1,000,000.   Specifically, Admiral pointed out that Liberty Mutual clearly engaged in a course of conduct in defending Girard Estate and KWPMI for the past seventeen months without a reservation of rights that led Girard Estate and KWPMI (and Admiral) to reasonably believe, to their detriment, that they had both $1,000,000 in coverage under the Primary Policy and an additional $5,000,000 in coverage under the Umbrella Policy for total of $6,000,000 in combined coverage under those policies.  A copy of Admiral's Counsel's letter to Liberty Mutual is attached hereto as **"Exhibit H."**

11

45.     On May 18, 2018, coverage counsel for Liberty Mutual issued correspondence in response to the May 4, 2018, correspondence.  In its May 18, 2018 letter, Liberty Mutual's coverage counsel contended, among other things, that the Umbrella Policy would only provide $1,000,000 in additional insured coverage to Girard Estate and KWPMI. A copy of Coverage Counsel's letter is attached hereto as **"Exhibit I."**

46.     Further, the May 18, 2018 letter from Liberty Mutual's counsel also contended, ***for the very first time during the course of the underlying May Lawsuit***, that the Liberty Mutual Umbrella Policy contains language in its "Other Insurance" clause that renders the Umbrella Policy excess over the Admiral Policy.  Liberty Mutual now attempts to assert this additional coverage defense despite the fact that Liberty Mutual has completely controlled the defense of Girard Estate and KWPMI and has been providing them with coverage under the Primary and Umbrella Policies for the last seventeen months without a reservation up through and including the April 9, 2018, mediation wherein Liberty Mutual offered $1,100,000 to settle the matter, all of which has led Girard Estate and KWPMI to reasonably believe, to their detriment, that Liberty Mutual would represent the interests of the Girard Estate and KWPMI appropriately and in good faith within the collective policy limits of $6,000,000 of the combined Primary and Umbrella Policies. See id.

47.     Moreover, it is self-evident that at the time of the April 9, 2018 mediation, Liberty Mutual offered $100,000 from its Umbrella Policy without ever mentioning or contending that the Admiral Policy must first apply first and exhaust before the Liberty Mutual Umbrella Policy would be triggered.

**Liberty Mutual Has Waived Or Is Estopped Or Otherwise Equitably Precluded From Asserting That The Umbrella Policy Only Provides For A $1,000,000 Limit For Girard Estate And KWPMI**

48. The allegations in the *May* Lawsuit trigger a defense and indemnification for Girard Estate and KWPMI as additional insureds on the Primary Policy, which is primary and non-contributory for Girard Estate and KWPMI up to the Primary Policy's $1,000,000 limit. Consequently, the Primary Policy affords a defense, on a primary and non-contributory basis, to Girard Estate and KWPMI for the *May* Lawsuit. Further, the Primary Policy affords $1,000,000 in indemnity, on a primary and non-contributory basis, to Girard Estate and KWPMI for the *May* Lawsuit. Liberty Mutual does not appear to dispute this.

49. Up through May 18, 2018, Liberty Mutual did not dispute that the allegations in the *May* Lawsuit, if proven to be true, would trigger an indemnification obligation on the part of Liberty Mutual for Girard Estate and KWPMI as additional insureds on the Umbrella Policy, with the Umbrella Policy sitting directly above the Primary Policy and being non-contributory with the Admiral Policy for Girard Estate and KWPMI up to the Umbrella Policy's applicable limit for the *May* Lawsuit.

50. This was clearly demonstrated by Liberty Mutual's offer of $1,100,000 at the April 9, 2018, mediation. This clearly signified that Liberty Mutual had understood that when the Primary Policy's $1,000,000 limits are exhausted, the Umbrella Policy is the next layer of insurance for Girard Estate and KWPMI and affords them with indemnity on a non-contributory basis up to the Umbrella Policy's applicable limits for the *May* Lawsuit.

51. However, as of May 18, 2018, Liberty Mutual now takes the position that due to the "Other Insurance" clause in its Umbrella Policy, that policy only affords excess coverage after exhaustion of the Primary Policy and the Admiral Policy.

13

52.     Liberty Mutual also disputes the applicable limit available to Girard Estate and KWPMI under the Umbrella Policy.  As indicated in Liberty Mutual's March 19, 2018, email and its subsequently letter addressed to Richard McClure of KWPMI (erroneously dated November 7, 2011), Liberty Mutual now takes the position that language in the Additional Insured Limitation LCU 20 01 10 10 endorsement applies to reduce the limits of the Umbrella Policy from $5,000,000 to $1,000,000 for Girard Estate and KWPMI for the *May* Lawsuit.

53.     Despite Liberty Mutual's contention to the contrary, the Additional Insured Limitation LCU 20 01 10 10 endorsement to the Umbrella Policy is properly interpreted to provide $5,000,000 in coverage limits to Girard Estate and KWPMI for the *May* Lawsuit.

54.     First, the Additional Insured Limitation LCU 20 01 10 10 endorsement states, among other things, that the Umbrella Policy's limit is limited to the "minimum amount of insurance … [r]equired by the contract or agreement …"  The applicable contract is the Agreement between KWPMI and Farrelly provides for a mere minimum amount of required insurance to be provided by Farrelly, but the Agreement does not preclude Farrelly from purchasing higher limits of coverage, which it apparently chose to do in this case, as evidenced by the Certificate of Insurance, dated July 31, 2014, that plainly indicated that Farrelly had procured the $1,000,000 Primary Policy and the $5,000,000 Umbrella Policy to satisfy its insurance requirements under the Agreement. Therefore, the Liberty Mutual Umbrella Policy is required to provide the full $5,000,000 limit to Girard Estate and KWPMI for the *May* Lawsuit.

55.     Alternatively, to the extent that there is an ambiguity as to the applicable minimum limit of umbrella liability coverage that Farrelly is required to purchase under the Agreement, the inclusion of that ambiguous language into the Umbrella Policy by virtue of the Additional Insured Limitation LCU 20 01 10 10 endorsement renders the Umbrella Policy

14

ambiguous as to the applicable policy limit of the Umbrella Policy to be afforded to Girard Estate and KWPMI. Because of this ambiguity, the Umbrella Policy must be construed against Liberty Mutual and is required to provide the full $5,000,000 limit to Girard Estate and KWPMI for the May Lawsuit.

56.     Further, even if the Additional Insured Limitation LCU 20 01 10 10 endorsement is interpreted to require the Umbrella Policy to provide only a $1,000,000 limit to Girard Estate and KWPMI (which Admiral denies), Liberty Mutual has engaged in conduct that constitutes a waiver and/or for which Liberty Mutual should be estopped or equitably precluded from now contending that language in the Additional Insured Limitation LCU 20 01 10 10 endorsement applies to reduce the limits of the Umbrella Policy from $5,000,000 to $1,000,000 for Girard Estate and KWPMI for the *May* Lawsuit.

57.     Specifically, Liberty Mutual never represented anything other than its Umbrella Policy's full $5,000,000 in coverage was available to Girard Estate and KWPMI, which is plainly demonstrated through Liberty Mutual's providing a defense and indemnification to Girard Estate and KWPMI under the Primary Policy and Umbrella Policy, ***without a reservation of rights***, and while unilaterally controlling the defense of Girard Estate and KWPMI in the May Litigation for seventeen (17) months, without ever once advising either Girard Estate, KWPMI (or Admiral) that the Umbrella Policy would only provide them with $1,000,000 in coverage.

58.     Girard Estate and KWPMI reasonably relied, to their detriment, on Liberty Mutual's representation that it would provide $5,000,000 in coverage under the Umbrella Policy.

59.     Under applicable law, Liberty Mutual has waived and/or should be estopped or otherwise equitably precluded from asserting coverage defenses in the form of an alleged reduction in policy limits on the Umbrella Policy from $5,000,000 to $1,000,000.  As such,

15

Liberty Mutual must continue to provide the $5,000,000 in coverage under the Umbrella Policy to Girard Estate and KWPMI as it represented it would provide to them during the last seventeen months in connection with the *May* Lawsuit.

60.     Moreover, Liberty Mutual has waived and/or is estopped or otherwise equitably precluded from asserting that the Admiral Policy must first exhaust prior to the Liberty Mutual Umbrella Policy being triggered to provide coverage to Girard Estate and KWPMI.  As such, Liberty Mutual must continue to provide the full $5,000,000 in coverage under the Umbrella Policy to Girard Estate and KWPMI without first requiring that the Admiral Policy first exhaust its limits, or even that it contribute toward settlement, in connection with the *May* Lawsuit.

## COUNT I
## DECLARATORY JUDGMENT

61.     Admiral hereby incorporates the preceding paragraphs of this Declaratory Judgment Complaint as though same were set forth at length herein.

62.     There is a genuine and bona fide dispute, controversy and disagreement between the parties regarding whether the language in the Additional Insured Limitation LCU 20 01 10 10 endorsement is properly interpreted to reduce the limits of the Umbrella Policy from $5,000,000 to $1,000,000. See, e.g., ACandS, Inc., 666 F.2d at 822-23; Yellowbird Bus Co. v. Lexington Ins. Co., 2010 U.S. Dist. LEXIS 69554, at *10-11.

63.     Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, Admiral requests that this Honorable Court declare that the Additional Insured Limitation LCU 20 01 10 10 endorsement is properly interpreted to provide $5,000,000 in coverage under the Umbrella Policy for Girard Estate and KWPMI in the *May* Lawsuit.

64.     Alternatively, if it is determined that the Additional Insured Limitation LCU 20 01 10 10 endorsement is properly interpreted to provide only $1,000,000 in coverage under the

Umbrella Policy for Girard Estate and KWPMI, then there is a genuine and bona fide dispute, controversy and disagreement between the parties regarding whether Liberty Mutual has waived, or is estopped or otherwise equitably precluded, from now relying upon the language in the Additional Insured Limitation LCU 20 01 10 10 endorsement as a coverage defense to reduce the applicable policy limits on the Umbrella Policy from $5,000,000 to $1,000,000 for Girard Estate and KWPMI in the *May* Lawsuit.

65.     Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, Admiral requests that this Honorable Court declare that Liberty Mutual has waived, or is estopped or otherwise equitably precluded, from now relying upon the language in the Additional Insured Limitation LCU 20 01 10 10 endorsement as a coverage defense to reduce the applicable policy limits on the Umbrella Policy from $5,000,000 to $1,000,000 for Girard Estate and KWPMI in the *May* Lawsuit.

66.     Additionally, there is a genuine and bona fide dispute, controversy and disagreement between the parties regarding whether Liberty Mutual has waived, or is estopped or otherwise equitably precluded, from now claiming that the Admiral Policy must first exhaust its policy limit before coverage under the Umbrella Policy applies for Girard Estate and KWPMI in the *May* Lawsuit.

67.     Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, Admiral requests that this Honorable Court declare that Liberty Mutual has waived, or is estopped or otherwise equitably precluded, from now claiming that the Admiral Policy must first exhaust its policy limit before coverage under the Umbrella Policy applies for Girard Estate and KWPMI in the *May* Lawsuit.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Admiral Insurance Company, prays as follows:

1.      For a declaration from this Honorable Court that Liberty Mutual is obligated to provide a defense and indemnification to Girard Estate and KWPMI as additional insureds on the Primary Policy on a primary and non-contributory basis up to the Primary Policy's $1,000,000 limit in connection with the *May* Lawsuit;

2.      For a declaration by this Honorable Court that if and when the Primary Policy's $1,000,000 limit is exhausted, Liberty Mutual is obligated to provide indemnification to Girard Estate and KWPMI as additional insureds on the Umbrella Policy on a non-contributory basis up to the Umbrella Policy's stated $5,000,000 limit in connection with the *May* Lawsuit;

3.      For a declaration that the Admiral Policy is excess over the Liberty Mutual Umbrella Policy such that the Umbrella Policy's $5,000,000 limits must first be exhausted before the Admiral Policy will be triggered to indemnify Girard Estate and KWPMI; and

4.      For such other and further relief this Honorable Court may deem just and proper.

DEASEY, MAHONEY & VALENTINI, LTD.

BY : _____
        HARRY G. MAHONEY, ESQUIRE
        WARD A. RIVERS, ESQUIRE
        STEVEN K. DILIBERTO, ESQUIRE
        Pa. Identification Nos. 19609/89493/82594
        1601 Market Street, Suite 3400
        Philadelphia, PA  19103
        T: 215-587-9400
        F: 215-587-9456
        Attorneys for Plaintiff,
        Admiral Insurance Company

Dated: June 14, 2018

Exhibit "A"

GAY CHACKER & MITTIN, P.C.
BY:   BRIAN S. CHACKER, ESQUIRE   **ATTORNEY FOR PLAINTIFFS**
IDENTIFICATION NO. 84284
1731 SPRING GARDEN STREET
PHILADELPHIA, PA  19130-3893
(215) 567-7955
FAX (215) 567-6809

## IN THE COURT OF COMMON PLEAS
## COUNTY OF PHILADELPHIA

TIMOTHY MAY and KATHARINE MAY, h/w   :
315 Blvd Avenue   :
Pitman, NJ 08071    : September Term, 2016
   :
   vs.     :
   :
GIRARD ESTATE FEE   : NO.
1101 Market Street, Suite 2600   :
Philadelphia, PA 19107   :
   :
GIRARD ESTATE LEASEHOLD   :
21 S. 12TH Street, 5th Floor   :
Philadelphia, PA 19107   :
   :
KENNEDY-WILSON PENNSYLVANIA   :
MANAGEMENT, INC.   :
1105 Market Street, Suite 105   :
Philadelphia, PA 19107   :

## CIVIL ACTION

### 2120 Premises Liability, Slip and Fall

1.    Plaintiffs, Timothy May and Katharine May, h/w are adult individuals residing a

the above captioned address.

2.    Defendant, Girard Estate Fee, is a non-profit corporation licensed and registered to

do business in the Commonwealth of Pennsylvania with a mailing address of 1101 Market Street, Suite 2600, Philadelphia, PA 19107.

3.     Defendant, Girard Estate Leasehold, is a non-profit corporation licensed and registered to do business in the Commonwealth of Pennsylvania with an office address located at 21 S. 12th Street, 5th Floor, Philadelphia, PA 19107.

4.     Defendant, Kennedy-Wilson Pennsylvania Management, Inc. is a Pennsylvania business corporation duly organized, existing and incorporated under the laws of the Commonwealth of Pennsylvania and maintains a headquatered business address at the above captioned address.

5.     On or about, Tuesday, May 5, 2015, at or about 5:15 p.m., the defendant's, owned, maintained and/or controlled the premises located at 1101 Market Street, Philadelphia, PA and known as the Aramark Tower.

6.     On or about, Tuesday, May 5, 2015, plaintiff, Timothy May was escorting an elevator worker to the 33rd floor outside service balcony. As he attempted to re-enter the building through the west side service balcony access door, he was caused to fall and strike his head on a support beam when the access door blew shut and struck plaintiff. After being struck by the door and hitting his head, Mr. May fell to the ground.  Mr. May suffered severe and permanent injuries as a result of same.

7.     The defective door was allowed to exist by the defendant's their agents, servants, workmen and/or employees existed for a sufficient period of time such that the defendant's knew, or in the exercise of reasonable care, should have known of its existence, and the danger it created for members of the public and/or working personnel.

## COUNT I

### Timothy May v. The Defendants

8.     Plaintiff incorporates herein by reference paragraphs 1 through 7 above as fully set forth at length below.

9.    Timothy avers that defendant's, are liable for the negligent acts of its agents, servants, workers, as set forth herein under the doctrine of Respondent Superior.

10.    The negligence of the defendants, consists of without limitation of the following:

a.    failing to have door stop for pump room door;

b.    failing to make reasonable inspection of pump room door to make sure it safe for persons working in the area;

c.    failing to inspect and maintain the door for hazards which would protect persons lawfully walking and/or working near its location;

d.    failing to put caution/warning signs on door;

e.    failing to inspect the aforesaid area and ascertain the hazardous condition which existed in said area at aforesaid time;

f.    permitting the aforesaid area to become and remain a nuisance, snare, trap for persons lawfully walking and/or working in, at and/or around the door;

g.    any and all acts of negligence which may be discovered pursuant to the Pennsylvania Rules of Civil Procedure;

11.    The accident resulted solely from the negligence of the defendants and was not caused by any act or failure to act on the part of the plaintiff, Timothy May.

12.    As a result of the aforesaid accident, plaintiff Timothy May sustained injuries which include, but are not limited to the following; prominent cervical cord compression and edema as well as moderate to severe canal stenosis @ C4-5 level secondary to a large eccentric to the left sided posterior disc osteophyte complex; reversal of the cervical lordosis; multilevel degenerative discogenic and spondylitic changes, most pronounced @ C4-5 and C6-7; C4-5 moderate DDD; broad based large eccentric to the left sided posterior disc osetophtye complex prominently effaces the ventral thecal sac & compresses the ventral cord; C6-C7 moderate DDD; moderate sized broad based posterior spondylitic disc bulge effaces the ventral thecal sac; severe bilateral foraminal stenosis; small disc bulges @ C3-4, C5-6 and C7-T1 and superimposed small central disc protrusion @ C3-4; mild canal stenosis C3-4; concussion; post concussive syndrome, all resulting

in two surgeries with the first consisting of anterior cervical diskectomy with complete decompression of spinal cord and nerve root, C4-5 and C6-7; anterior cervical fusion. C4-5 & C6-7; use of allograft bone structural; anterior cervical plating C4-5 and C6-7; use of spinal cord and nerve root monitoring and the 2nd surgery consisting of revision cervical spine surgery; posterior C3-C7 cervical laminectomies; bilateral C3-4, C4-5, C5-6 and C6-7 foraminotomies; C3-C7 medicrea pass oct lateral mass fixation and fusion without autologous spinous process/laminar graft; autograft procurement.

13.     As a direct and proximate result of the conduct of the defendants, plaintiff, Timothy May has and will continue to suffer in the future great pain and suffering with mental and physical traumatic anxiety reaction, nervousness and other psychological and emotional disorders depriving the plaintiff of life's pleasures together with great embarrassment and humiliation.

14.     As a direct and proximate result of the conduct of the defendants, plaintiff, Timothy May will in the future continue to spend large sums of money for medicine and medical care in and about an effort to affect a cure for the aforesaid injuries.

15.     As a direct and proximate result of the conduct of the defendants, plaintiff, Timothy May has and will in the future be unable to attend or perform his usual daily duties and activities all to his great detriment and loss.

16.     As a further direct and proximate result of the conduct of the defendants, plaintiff, Timothy May, has been and will in the future be deprived of earnings and earning capacity all to his great financial detriment and loss.

WHEREFORE, Plaintiff, Timothy May, demands damages of Defendant, Girard Estate Fee, Girard Estate Leasehold and Kennedy-Wilson Pennsylvania Management, Inc., jointly and severally in a sum in excess of Fifty Thousand Dollars ($50,000), plus costs.

## COUNT II

### Katharine May v. The Defendants

17.     Plaintiff incorporates herein by reference paragraphs 1 through 16 above as fully set forth at length below.

18.    At all times relevant to this lawsuit, plaintiff, Katharine May, was and is the lawful wife of plaintiff, Timothy May.

19.    As a direct and proximate result of the aforementioned injuries to the plaintiff, Timothy May, plaintiff, Katharine May has been deprived of the sex, companionship and services of his wife and he will be deprived of the same for an indefinite time in the future, all to his great detriment and loss.

20.    As a direct and proximate result of the aforesaid, plaintiff, Katharine May, has ans will in the future, be obligated to expend various sums of money in an about an effort to effect a cure for her husband of his injuries.

WHEREFORE, Plaintiff, Katharine May, demands damages of Girard Estate Fee, Girard Estate Leasehold and Kennedy-Wilson Pennsylvania Management, Inc., jointly and severally in a sum in excess of Fifty Thousand Dollars ($50,000), plus costs.

Respectfully submitted,
GAY CHACKER & MITTIN, P.C.

BRIAN S. CHACKER, ESQUIRE
Attorney for Plaintiffs

## VERIFICATION

The undersigned, having read the attached pleading, hereby verifies that the within pleading is based on information furnished to counsel, which information has been gathered by counsel in the course of this lawsuit. The language of the pleading is that of counsel and not the signer. Signer verifies that he/she has read the within pleading and that it is true and correct to the best of signer's knowledge, information and belief. To the extent that the contents of the pleadings are that of counsel, verifier has relied upon counsel in taking this Verification. This Verification is made subject to the penalties of 18 Pa. C.S. Section 4904, relating to unsworn falsification to authorities.

DATED: 9/26/16

_____
TIMOTHY MAY

**VERIFICATION**

The undersigned, having read the attached pleading, hereby verifies that the within pleading is based on information furnished to counsel, which information has been gathered by counsel in the course of this lawsuit. The language of the pleading is that of counsel and not the signer. Signer verifies that he/she has read the within pleading and that it is true and correct to the best of signer's knowledge, information and belief. To the extent that the contents of the pleadings are that of counsel, verifier has relied upon counsel in taking this Verification. This Verification is made subject to the penalties of 18 Pa. C.S. Section 4904, relating to unsworn falsification to authorities.

DATED: 9/26/16

_____
KATHARINE MAY

Case ID: 160903393

Exhibit "B"

# AGREEMENT FOR ENGINEERING SERVICES

This agreement is made this 11th day of December 2003 between FARRELLY BUILDING SERVICES, INC. (hereinafter "Contractor") and KENNEDY-WILSON PENNSYLVANIA MANAGEMENT INC., a Delaware corporation, ("KWPMI"), not personally but solely on behalf of GIRARD ESTATE LEASEHOLD, a Pennsylvania non profit corporation ("Owner"), which owns the property commonly known as ARAMARK Tower ("Property"), for services to be performed at the Property.

## ARTICLE I.   RECITALS

WHEREAS, KWPMI has been appointed managing agent of the Property and has been authorized by the Owner to enter into and administer this agreement on its behalf, and

WHEREAS, the Contractor is engaged in the business of performing services for buildings and wishes to perform engineering services at the Property on behalf of and at the request of KWPMI;

NOW THEREFORE, in consideration of the following mutual covenants and promises the parties hereby agree as follows:

## ARTICLE II.   CONSIDERATION

SECTION A. CONTRACTOR'S DUTIES

1.   General:   The contractor shall perform services, as specifically outlined in Exhibit A, attached to this agreement and incorporated by this reference.   The descriptions of the duties contained in the exhibit shall serve as minimum standards guide only and in no way shall they be construed to limit the responsibilities of the contractor to provide engineering employment services consistent with other Class A buildings in the Metropolitan Philadelphia area.

2.   Personnel:   The Contractor shall provide, at its sole cost and expense, all personnel necessary to perform its duties.

 a. Contractor's personnel shall be neat, clean and acceptable to KWPMI, in its sole discretion.   The Contractor shall transfer or release as the Contractor deems appropriate, any personnel that, with or without cause, KWPMI finds unacceptable.

 b. All personnel shall be dressed in a uniform provided by the Owner.

 c. The Contractor shall provide, and Contractor's personnel shall carry, an identification card indicating the Contractor's name and the name and photograph of the personnel, and union identification, if any.

 d. All Contractor's employees shall be covered by a policy of Comprehensive Crime Insurance, in an amount of not less than $50,000/occurrence $50,000/aggregate.

3. <u>Equipment</u>: The Contractor shall provide its personnel with all necessary equipment and supplies. The Contractor shall provide such equipment and supplies as are appropriate, in the professional opinion of the Contractor, to perform the duties in the most efficient and safest manner possible. The contractor shall only use the equipment and supplies for their intended use(s), and shall discontinue usage of any product which, in the sole discretion of KWPMI, is inappropriate for its designated use, however, the right of KWPMI to prohibit usage of a product shall not relieve the Contractor of its requirement to exercise its professional judgment. Equipment and supplies shall not be removed from the Property. The Owner shall approve and provide payable accounting for supplies and equipment, which shall be directly paid for at the time of acquisition. The cost of supplies and equipment shall be the Owner's responsibility. Supplies and equipment shall be the possession of Owner upon termination of the contract. The parties shall prepare a joint inventory of the assets covered by this provision within ten working days of the execution of this agreement.

4. <u>Insurance</u>. Commencing with performance of Contractor's services hereunder and continuing during the term of this agreement, Contractor shall provide insurance policies, or self insure, and maintain said coverage in full force and effect. Said coverage is to be with responsible carriers and said policies are to be of the following types and amounts:

4.1 a. <u>Worker's Compensation</u>
Worker's compensation and employer liability insurance, which shall comply with the statutory requirements of the Commonwealth of Pennsylvania and any other state in which the services are being performed and shall apply to all persons employed by Contractor.

b. <u>Comprehensive Liability</u>
Comprehensive general liability insurance including bodily injury, property damage, contractual liability and automobile liability (owner, non-owned and hired) in an amount of not less than $2,000,000 combined single limit.

c. <u>Certificate of Insurance.</u>
Contractor shall deposit with KWPMI certificates issued by the insurance company or companies issuing said insurance policies, which certificates shall provide that thirty (30) days' written notice shall be given KWPMI prior to cancellation or reduction of coverage of any such policy. KWPMI shall have the right to examine, at all times during business hours as requested by KWPMI, all original insurance policies so secured by Contractor.
Each subcontractor, and/or sub-subcontractors of any tier, shall have the following manuscript specifically endorsed to its Comprehensive General Liability or Excess Liability policies covering this project:

"It is hereby agreed and understood that all the parties listed on page 2 of this Rider are hereby added as additional insured. The coverage afforded the additional insured under this policy shall be primary insurance. If the

additional insured has other insurance, which is applicable to the loss, such other insurance shall be on an excess or contingent basis. The amount of the Company's liability under this policy shall not be reduced by existence of such other insurance.

It is further agreed that the coverage afforded to the additional insured shall not apply to the sole negligence of each additional insured."

4.2   Each subcontractor, and/or sub-subcontracts of any tier, shall furnish Contractor before commencing Work, Certificate of Insurance, evidencing compliance with the minimum requirements listed above. Each certificate will not be canceled or reduced    without (30) days prior written notice to the Contractor.

4.3   Property insurance: Except as otherwise provided herein below, the Owner shall purchase and maintain property insurance on the building with amounts and coverage, as the Owner deems satisfactory.

4.3.1 The contractor shall purchase and maintain property insurance on goods and building materials to the full insurable   value thereof, while such goods are in transit or while stored at the work site or any other location. This insurance shall include the interests of the Owner, Contractor, and subcontractors in the work, and shall insure against, Fire, Extended Coverage and All Risk Perils. This policy of insurance shall bear a deductible no greater that $1,000 each occurrence and such deductible shall be borne by the Contractor.

4.3.2 The Owner, Contractor and all subcontractors of any tier, waive all rights against each other for damage caused by fire or other perils to the extent covered by insurance described in this Rider, except such rights as they may have to the proceeds of such insurance.

4.3.3 The Owner shall not be responsible for nor shall the Owner insure the property of the Contractor and/or subcontractor of any tier including but not limited to, tools and equipment, located at the job site which is not intended to be incorporated into the work.

4.3.4 Each    Contractor,    subcontractor,    and/or    sub-subcontractor of any tier shall maintain contractors Equipment floater insurance for owned or leased equipment under his care, custody and control as required for the performance of said Contractor's duties. Aforementioned insurance shall list as additional insured the following parties as their interest may appear:

Girard Estate Leasehold, a Pennsylvania nonprofit corporation; Girard Estate Fee, a Pennsylvania nonprofit corporation; Kennedy-Wilson Properties, Ltd.; Kennedy-Wilson Pennsylvania Management, Inc.;

and their respective partners, members, agents, and employees.

5.   Compliance with Federal, State and Local Law:   The Contractor shall comply with all laws, ordinances, rulings, rules and regulations as may affect the employment of the Contractor's personnel and performance of its duties.   The Contractor shall pay for any and all permits, licenses, or fees necessary to perform its duties.   The costs for such permits, licenses or fees are to be directly reimbursed by KWPMI. Costs for such permits, licenses or fees are to be directly reimbursed by KWPMI.

6.   Payment of taxes and Contributions:   The Contractor shall pay any and all taxes and contributions assessed against Contractor for Unemployment Insurance, Old Age Retirement Benefits, pensions and annuities now imposed, or hereafter imposed by any Government unit, which is measured by wages salaries or other remuneration paid to persons employed by Contractor or any of its subcontractors in connection with the service Contractor is required to perform and/or has performed under the terms of the agreement.   The Contractor shall provide copies of its payroll books and records, including payment instruments upon reasonable request of KWPMI.   Contractor agrees to pay all applicable municipal, state, county or local sales, use, gross receipts or other related taxes arising out of, or relating to, the performance of this agreement, KWPMI shall reimburse Contractor the amount of any such tax(es) paid, provided however, KWPMI shall not reimburse Contractor for its corporate income taxes.

7.   Reporting:   The Contractor shall require each of its employees to sign in and out of the building each time an employee enters or leaves the premises.   The Contractor shall report, in writing on a monthly basis, the services performed within the building.   The contractor shall report to KWPMI, on an as needed basis, all items, which its employees recognize as being in need of repair or replacement, such that KWPMI is able to maintain a First Class building.   A standard computerized reporting format will be identified by KWPMI.   The support vendor will also be identified.   The licensing and cost associated for software and support will be required by the Contractor. KWPMI shall reimburse the Contractor for the cost of support without Contractor markup.

SECTION B. OWNER'S DUTIES.

1.   KWPMI shall pay to Contractor each month for the services rendered as in accordance with Exhibit "A" and Exhibit "B".   The parties hereto agree that the attached Exhibit "B" reflects the effective costs as of 12/15/03.   On or about January 31, 2004, Contractor shall supply a replacement Exhibit "B", which will reflect new union benefit figures.

ARTICLE III. TERM AND CANCELLATION

SECTION A. TERM.

Unless otherwise canceled pursuant to the terms of this agreement, the term of this contract shall be from January 1, 2004 to February 28,2006 at 12:00 Midnight.   Thereafter, unless canceled, this contract shall continue on a month-to-month basis.

## SECTION B. CANCELLATION.

Both parties to this agreement shall have the right to cancel this agreement, with or without cause, upon 30 days prior written notice, provided however, that in the event that KWPMI (or successor or assign) terminates Contractor without cause, KWPMI (or such successor or assign) shall reimburse Contractor for any payments made to employees (for other than hours actually worked) who have been terminated without sufficient time for Contractor to comply with the requirements of the Worker Adjustment and Retraining Act (WARN), provided further, that in the event of termination of this contract for cause, neither party shall be responsible to the other for the incurrence of costs not expressly contemplated by this Agreement, except that Contractor shall remain responsible for its property damage and/or bodily injury liabilities as set forth in Article IV, Indemnification, below, which were incurred prior to the effective date of termination.

## ARTICLE IV. INDEMNIFICATION

To the extent allowable by law, the Contractor shall indemnify, defend and hold harmless the OWNER, KWPMI and each of its respective principals, partners, directors, officers, shareholders, beneficiaries, trustees, employees, Owners, successors, and assigns from:

A.  any claim arising out of or related to the execution of the duties required pursuant to this agreement, caused by the negligent act or omission or willful acts of the Contractor and its Agents, subcontractors or employees or injury caused by conditions now existing or hereafter created on the Property or in the facilities, materials and equipment located there arising out of the operations performed by or on behalf of Contractor, but only to the extent of damages directly caused by the negligence of Contractor, and injury to or the death of Contractor's officers, agents, owners, employees, or loss or damage to Contractor's facilities, materials, and equipment, except such liability as cannot be waived by Contractor as a matter of law in the jurisdiction of performance of the services in this Agreement; and

B.  any infringement of any patent or copyright arising out of or in connection with the performance of said services or the use of materials and equipment furnished for or in connection with said services; and

C.  any taxes, penalties, interest and/or fines assessed KWPMI or the OWNER arising out of or relating to the performance of the work hereunder by Contractor, by any governmental unit; and

D.  any funds assessed against any of the foregoing entities for pension, welfare, vacation annuity and other union benefits, contributions, payable under or in connection with labor agreements, with respect to all persons, by whomsoever employed, engaged in the performance of the services under this agreement; and

E.  any attorneys' fees and other expenses, including interest, that KWPMI and or/any of the foregoing indemnified entities incurs, arising out of the performance of this

5

agreement by Contractor, or defending against any charges assessed hereunder.

No party to this Agreement shall be responsible to any other party for punitive, exemplary, incidental or consequential damages, provided however, that the foregoing shall not apply to claims for contribution by one party of the other for the satisfaction of obligations to third parties for bodily injury, to the extent such obligations were the proven result of negligent acts or omissions of the party from which contribution is sought.


## ARTICLE V. DEFAULT

In the event of a material default by the Contractor, Owner shall, in its sole discretion, send notice of the default to Contractor and demand strict compliance with the terms of this agreement, cancel this agreement upon five (5) days written notice to Contractor; or cure the default, with or without notice to the contractor, and deduct the costs and charges incurred from any payment due at the time of the default or from payment which becomes due; and if no further payment is due, Contractor agrees to immediately, upon presentation, pay all charges incurred hereunder, pursuant to the provisions of Article III, Section B, Cancellation.


## ARTICLE VI. AUDIT

As to all services for which compensation may include either reimbursement to Contractor for costs or payment based upon quantity of service or products, Owner's duly authorized representatives (including internal auditors) shall have at all reasonable times, access to and the right to reproduce records, books, documents, files receipts, vouchers, data stored in computers and memoranda of every description, as well as the right to interview personnel, necessary to audit and verify Contractor's charges to Owners hereunder. Contractor agrees to preserve and retain records, books, documents, files, receipts, vouchers, data and memoranda related to charges hereunder for a period of three (3) years following the date of final payment for Contractor's services hereunder. Owner's representatives also shall have sufficient audit access to Contractor's records in the fixed rate areas to satisfy themselves that all services that are supposed to be included in Contractor's fixed rates are performed.


## ARTICLE VII.  LIENS AND ENCUMBRANCES

Contractor agrees to protect Owner from all liens for labor performed, materials supplied or used by Contractor and/or any other person in connection with the services undertaken by Contractor hereunder, and shall not, at any time during the term of Contract suffer or permit any lien or attachment or encumbrance to be imposed by any person, firm or corporation upon Owner's property or any improvements thereon, by reason of any claim or demand against Contractor arising out of Contractor's failure to perform pursuant to this agreement.  Owner shall have the right to cure any liens, attachments or encumbrances in the event Contractor fails to do so, and charge Contractor for any amount expended curing such items.

## ARTICLE VIII. ASSIGNMENTS AND SUBCONTRACTS

It is expressly understood and agreed that this agreement is personal to Contractor and was awarded to Contractor based upon its professional knowledge. Contractor shall have no right, power or authority to assign this agreement or any portion thereof, either voluntarily or involuntarily, or by operation of law, and that Contractor shall not have any right, power or authority to sublet, or subcontract the services to be performed hereunder, or any portion thereof, without KWPMI 's express written approval and consent being first had and obtained. Neither approval or consent by KWPMI for Contractor to enter into any subcontract or the failure or performance thereof by any such subcontractor shall relieve, release or affect, in any manner, any of Contractor's duties, liabilities or obligations hereunder, and Contractor shall be and remain liable hereunder to the same extent as if no subcontract had been made or entered into. Except to the extent above indicated, all of the rights, benefits, duties, liabilities and obligations of the parties hereto shall inure to the benefit of and be binding upon their respective successors and assigns.

## ARTICLE IX. INDEPENDENT CONTRACTORS

Contractor shall be an independent contractor with respect to the services to be performed hereunder. Neither Contractor nor employees of either shall be deemed to be the servants, employees or agents of the Owner.

## SECTION X. MISCELLANEOUS

### SECTION A. NON-RECOURSE CONTRACT

This agreement and all the terms and conditions hereof (including, without limitation, any and all hold harmless agreements and indemnifications herein provided) shall inure to the benefit of Owner, KWPMI and their respective partners, trustees, beneficiaries, shareholders, directors, officers, employees, agents and servants and to the successors and assigns thereof and shall be binding on Contractor and its permitted successors and assigns.

It is expressly understood and agreed by and between the parties hereto, notwithstanding anything herein contained to the contrary, that no personal recourse shall be had by Contractor (or any person claiming by, through or under Contractor) for the payment or performance of any obligation under, or for any claim based on this agreement against Owner, KWPMI or against any principal, partner, director, officer, shareholder, beneficiary, trustee, employee, agent, successor, or assign of Owner or KWPMI beyond the interest or solely to the interests of Owner in the Property with respect to any and all such claims and that all other personal liability of the above-described persons and entities is hereby expressly waived by Contractor and by all persons claiming by, through or under Contractor.

## SECTION B. WARRANTY

All required services shall be performed to the complete satisfaction of KWPMI.

## SECTION C. NOTICE

Any written notice required to be made, or to be given by Contractor to Owner shall be addressed to:

Kennedy-Wilson Pennsylvania Management Inc.
1101 Market Street, Suite 105
Philadelphia, PA 19107
Attn: Property Manager

and any written notice required or made to be given by Owner or KWPMI to Contractor shall be addressed to:

Mr. Michael P. Farrelly
President
Farrelly Building Services, Inc
1307 Ynez Place
P.O. Box 182089
Coronado, CA 92178-2089

Any and all written notices shall be delivered in person or shall be sent by certified or registered mail, with return receipt requested and shall be deemed effective when deposited in the United States Post Office, postage prepaid, and addressed as above provided. The parties hereto may, by notice in writing, designate another address to which notice shall be given pursuant to this Agreement.

## SECTION D. WAIVER

A waiver of any term or condition at any time or times shall not be construed as a waiver of the same or any other term or condition at any other time or times.

## SECTION E. ENTIRE AGREEMENT

All negotiations and agreements are merged herein and there are no provisions, covenants, or other agreements between the parties other than those contained herein or incorporated herein by reference. This agreement is the entire agreement between the parties hereto with respect to the subject matter hereof.

## SECTION F. MODIFICATION

This agreement may only be modified by a writing signed by the party to be charged.

## SECTION G. CHOICE OF LAW

This agreement shall be construed under the laws of the State of Pennsylvania. The Contractor hereby consents to the jurisdiction of the courts of the Commonwealth of Pennsylvania.

## SECTION H. NONDISCRIMINATION CLAUSE

During the term of this contract, Contractor agrees as follows:

1. Contractor shall not discriminate against any employee, applicant for employment, independent contractor or any other person because of race, color, religious creed, handicap, ancestry, national origin, age or sex.

Contractor shall take affirmative action to insure that applicants are employees, and that employees or Owners are treated during employment, without regard to their race, color, religious creed, handicap, ancestry, national origin, age or sex. Such affirmative action shall include, but is not limited to: employment, upgrading, demotion, or transfer, recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training. Contractor shall post in conspicuous places, available to employees, Owners, applicants for employment and other persons, a notice setting forth the provisions of this nondiscrimination clause.

2. Contractor shall, in advertisements or requests for employment placed by it or on its behalf, state that all qualified applicants will receive consideration for employment without regard to race, color, religious creed, handicap, ancestry, national origin, age or sex.

3. Contractor shall send each labor union or workers' representative with which it has a collective bargaining agreement or other contract or understanding, a notice advising said labor union or worker's representative of its commitment to this nondiscrimination clause. Similar notice shall be sent to every other source of recruitment regularly utilized by Contractor.

4. It shall be no defense to a finding of noncompliance with this nondiscrimination clause that Contractor had delegated some of its employment practices to any union, training program, or other source of recruitment, which prevents it from meeting its obligations. However, if the evidence indicates that the Contractor was not on notice of the third-party discrimination or made a good faith effort to correct it, such mitigating factor shall be considered in determining appropriate sanctions.

5. Where the practices of a union or any training program or other source of recruitment will result in the exclusion of minority group persons such that Contractor will be unable to meet its obligations under this nondiscrimination clause, Contractor shall then employ and fill vacancies through other nondiscriminatory employment procedures.

6. Contractor shall comply with all state and federal laws prohibiting discrimination in hiring or employment opportunities. In the event of Contractor's noncompliance with the nondiscrimination clause of this contract or with any such laws, this contract may be terminated or suspended, in whole or in part, and Contractor may be declared

temporarily ineligible for KWPMI contracts, and other sanctions may be imposed and remedies invoked.

7.   Contractor shall furnish all necessary employment documents and records, and permit access to its books, records and accounts by the contracting agency for purposes of investigation to ascertain compliance with the provisions of this clause. If Contractor does not possess documents or records reflecting the necessary information requested, it shall furnish such information on reporting forms supplied by KWPMI.

8.   Contractor shall actively recruit minority and women subcontractors or subcontractors with substantial minority representation among their employees.

9.   Contractor shall include the provisions of this nondiscrimination clause in every subcontract, so that such provisions will be binding upon each subcontractor.

10.   Contractor obligations under this clause are limited to the facilities covered by this agreement.

OWNER:

GIRARD ESTATE LEASEHOLD, a Pennsylvania non profit corporation

KENNEDY-WILSON PENNSYLVANIA MANAGEMENT INC., a Delaware corporation, its managing agent

By: _____
        Richard J. McClure

Its:        Vice President

CONTRACTOR:

Farrelly Building Services, Inc., a California corporation

By: _____
        Michael P. Farrelly

Its:        President

10

EXHIBIT "A"

SCOPE OF WORK
FOR ENGINEERING OPERATIONAL
MAINTENANCE SERVICES

Contractor shall provide the engineering staff at the "Property" for the duration of this contract. The fee shall be three and one-half (3.5%)percent, expressed as a percentage of the total payroll cost. The payroll cost shall be defined as the actual straight-time hourly rate of individuals approved to provide services for the Owner times hours worked, vacation, personal and sick hours as provided by the union contract, and any overtime authorized by the Owner, plus actual Workers' Compensation Insurance costs, actual payroll taxes incurred and actual cost incurred for providing other direct benefits in accordance with the current union contract. Payroll costs do not include any cost associated with administration, corporate, or accounting personnel supplies.

The fee shall be three and one-half (3.5%) percent of all payroll and benefit cost. The cost of health and welfare shall be as detailed on Exhibit "C". Annual increases shall be allowable to the extent of increases to the Contractor's overall cost of benefits. Workers' Compensation Insurance, expressed as a percentage of the hourly compensation paid to the staff shall be 10.64%, increases or decreases will be acceptable based on actual changes to Contractor's costs of obtaining the insurance. This increase shall be limited to the same increase in Contractor's national cost for Worker's Compensation.

The responsibility and obligations of the Contractor shall include the following:

1.  **PAYROLL SERVICES.** The Contractor shall provide payroll services consistent with the requirements of its union contract, if any, governing laws and acceptable general payroll accounting principles. Monthly statements shall be delivered to Owner with the following information:

    a.  Employee names and rates.
    b.  Hours each employee worked.
    c.  Overtime hours of each employee.
    d.  Breakdown of benefit and Workers' Compensation Insurance cost as well as the period covered for these costs.
    e.  Owner approval of overtime or explanation for emergency overtime.
    f.  Payroll taxes.
    g.  Contractor's fee.
    h.  Total invoice.

2.  **TIMEKEEPING.** Contractor shall perform timekeeping services and records. This shall be done in a way to minimize the efforts by the staff at the Property. Time cards shall be approved by Chief Engineer and Property Manager then forwarded to the Contractor. Time records shall be archived by Contractor for Owner until Owner authorized distribution of records.

3.    OVERTIME APPROVAL.   All overtime must be pre-approved by Owner unless an emergency situation requires the same.   An emergency shall be defined as a situation in which building services are diminished, imminent threat to the building exists or an imminent safety concern requires overtime hours.

4.    WORKERS' COMPENSATION.   Contractor shall at all times provide Workers' Compensation Insurance on the entire engineering staff at the Property in accordance with the State of Illinois requirements.

5.    GARNISHMENTS.   All wage garnishments as required by appropriate legal means shall be the responsibility of Contractor to process and account for in the payroll processing.

6.    NEGOTIATIONS WITH UNION.   Contractor shall provide for union negotiations, when the occasion arises.

7.    CONTRACTS WITH THE UNION.   It shall be the responsibility of Contractor to maintain a contract with the union, if any, pursuant to the principles of the National Labor Relations Act.

8.    ARBITRATIONS.   Any arbitrations or labor disputes shall be the responsibility, including legal expenses, of the Contractor to resolve.   Cost issues shall be settled in good faith, in Owner's interest and with Owner's review and approval, which shall not be unreasonably withheld.

9.    PAYROLL TAXES.   Contractor shall pay any and all payroll taxes required by law.   Proof of payment shall be provided, showing monthly payment amounts.

10.   DISCIPLINARY ACTIONS AND DISMISSALS.   Contractor shall be responsible for executing disciplinary actions and dismissals of employees, in accordance with its union, contract, if any, and its normal employment practices.

11.   STAFFING.   Contractor shall be the employer of the existing staff, consisting of four (4) engineering individuals.   No changes in rate or individuals by Contractor without approval from Owner, which shall not be unreasonably withheld.   Under no circumstances will Contractor offer employment at any other location to any staff at the property without consent of Owner.   Staffing levels will not be altered without approval from Owner.

12.   JOB RESPONSIBILITY.   Contractor shall provide for its Employees (the property engineering and maintenance staff) to perform Preventative Maintenance of building equipment, tenant work request, repair of building equipment, operation and testing of building equipment and other duties consistent with Owner's procedures and directives as well as Contractor's safety standards, except as otherwise agreed between Owner and Contractor.

The responsibility and obligations of the Owner shall include the following:

1.    PAYMENT.   Invoicing shall be on a "prebill" basis at the beginning of each month, with all sums due and payable within 30 days of presentation of the invoice.   Amounts shown in the prebill

will include, without limitation, the anticipated costs and fees for the applicable period. Late payments will be subject to a fee of 1 ½ % of unpaid amounts per month, or portion thereof, from the due date until the date paid. Reconciliation of the invoice shall occur in the month following the presentation of the invoice, and amounts applied (credit or debit), if any, to the subsequent invoice to be issued following the reconciliation.

Payment for items and services set forth in Article II, Section A, paragraph 3 of this Agreement shall be made directly by KWPMI at the time of purchase.

KWPMI may withhold portions of invoices that are in dispute, until the dispute is resolved, but in no event can the withheld portion of a due payment exceed the amount in dispute.

2.   OPERATION.  Owner shall provide operational management, policies, inspections, purchasing procedures, material purchases, engineering oversight and other Technical Services.

3.   SUBSTANCE ABUSE TESTING  Owner/KWPMI shall be responsible for all costs and arrangements for the administering of all substance abuse testing.

FARRELLY BUILDING SERVICES                    EXHIBIT B

| As of 12/15/03 | | Hourly Rate | Workers Comp. | Payroll Tax | PLPD | Union Benefits | Other Costs |
|---|---|---|---|---|---|---|---|
| ARAMARK Tower | Angelow, H | 29.74 | 3.16 | 2.38 | 0.98 | 17.02 | 1.87 |
| Philadelphia, PA | Cretarolo, E | 26.45 | 2.81 | 2.12 | 0.87 | 17.09 | 1.73 |
| | Memmo, D | 24.12 | 2.57 | 1.95 | 0.80 | 17.09 | 1.63 |
| | Michalowski, J | 24.12 | 2.57 | 1.95 | 0.80 | 17.33 | 1.64 |
| Total | | 104.43 | 11.11 | 8.39 | 3.45 | 68.53 | 6.86 |
| ANNUALIZED | | 217,214.40 | 23,111.61 | 17,448.90 | 7,168.08 | 142,541.09 | 14,261.94 |
| TOTAL | 421,746.02 | | | | | | |

AMENDMENT TO
AGREEMENT FOR ENGINEERING SERVICES
BETWEEN OWNER AND CONTRACTOR

ARAMARK TOWER

THIS AMENDMENT TO SERVICE AGREEMENT ("Amendment") is made effective the 1st day of March, 2006, by and between Farrelly Building Services, Inc. ("Contractor") and Kennedy Wilson Pennsylvania Management Inc. ("KWPMI"), not personally but solely on behalf of Girard Estate Leasehold ("Owner") for services to be performed at that certain property located at 1101 Market Street, Philadelphia, PA 19107 (hereinafter called the "Property").

BACKGROUND

Kennedy Wilson Pennsylvania Management Inc., on behalf of Owner, Girard Estate Leasehold, and Farrelly Building Services, Inc., as Contractor, entered into a Service Agreement dated December 11, 2003 ("Agreement"), relating to certain services provided at the Property.

Whereas Contractor entered into a new Agreement with Local 835, International Union of Operating Engineers, AFL-CIO, effective March 1, 2006 through February 28, 2011. Said Agreement is attached hereto as Attachment 1 ("Union Agreement").

Owner and Contractor desire to amend the Agreement upon the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the premises and of the mutual promises contained herein, and intending to be legally bound hereby, the parties agree as follows:

All capitalized terms used herein without definition shall have the meanings ascribed to them in the Agreement.

Notwithstanding anything to the contrary set forth below, all terms and conditions of the Agreement shall remain in full force and effect as amended hereby.

1. Total compensation for the provision of services under the Agreement will be on a monthly basis and will be based on hours worked by employees, according to the following hourly rates. The rates provided herein supercede the rates as identified in Exhibit "B" of the Agreement.

| Costs as of 3/1/2006 | | Hourly Rate | Workers Comp. | Payroll Tax | PLPD | Union Benefits | Other Costs |
|---|---|---|---|---|---|---|---|
| | Angelow, H | 32.29 | 2.01 | 2.63 | 0.99 | 10.59 | 1.70 |
| | Creterolo, B | 28.91 | 1.80 | 2.37 | 0.88 | 10.59 | 1.56 |
| | Memmo, D | 26.36 | 1.64 | 2.17 | 0.81 | 10.59 | 1.45 |
| | Michalowski, J | 26.36 | 1.64 | 2.17 | 0.81 | 9.33 | 1.41 |
| Sub-Total | | 113.92 | 7.10 | 9.34 | 3.49 | 41.09 | 6.12 |
| ANNUALIZED | | 236,953.60 | 14,762.21 | 19,430.95 | 7,250.78 | 85,465.17 | 12,735.19 |
| TOTAL | 376,597.91 | | | | | | |

2.  The rates, as provided in Paragraph 1 of this Amendment, are subject to adjustment based upon the Union Agreement.

3.  The termination date described in Article III, Section A thereof, shall be February 28, 2011.

4.  The provisions of this Amendment shall be binding upon and inure to the benefit of the successors and assigns of the parties hereto.

IN WITNESS WHEREOF the parties have executed this Agreement as of the date first written above.

OWNER

By:   GIRARD ESTATE LEASEHOLD,
      a Pennsylvania not-for-profit corporation

      By:   Kennedy Wilson Pennsylvania
            Management Inc., a Delaware
            corporation, its managing agent

      By:   _____
            Richard J. McClure

      Its:  Director/Vice President


CONTRACTOR

By:   FARRELLY BUILDING SERVICES,
      INC.

      By:   _____
            Michael P. Farrelly

      Its:              President

Exhibit "C"

317774

**ACORD®**

## CERTIFICATE OF LIABILITY INSURANCE

| DATE (MM/DD/YYYY) |
|---|
| 7/31/2014 |

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW.  THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT:  If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed.  If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement.  A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | | CONTACT NAME: Deborah Walker | | |
|---|---|---|---|---|
| Commercial Lines - (760) 931-3500 | | PHONE (A/C, No, Ext): (760) 931-3538 | | FAX (A/C, No): |
| Wells Fargo Insurance Services USA, Inc. - CA Lic#: 0D08408 | | E-MAIL ADDRESS: deborah.l.walker3@wellsfargo.com | | |
| 5901 Priestly Drive | | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| Carlsbad, CA 92008 | | INSURER A : Liberty Mutual Fire Insurance Co | | 23035 |
| INSURED | | INSURER B : Liberty Insurance Corporation | | 42404 |
| Farrelly Building Services, Inc | | INSURER C : Employers Insurance Company of Wausau | | 21458 |
| 124 Front Street, Suite 203 | | INSURER D : | | |
| | | INSURER E : | | |
| Massapequa Park NY 11762 | | INSURER F : | | |

| COVERAGES | CERTIFICATE NUMBER: 8020955 | REVISION NUMBER: See below |
|---|---|---|

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED.  NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|---|
| A | X | COMMERCIAL GENERAL LIABILITY | | | TB2-Z91-455039-034 | 08/01/2014 | 08/01/2015 | EACH OCCURRENCE | $ 1,000,000 |
| | | CLAIMS-MADE  X  OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 300,000 |
| | | | | | | | | MED EXP (Any one person) | $ 5,000 |
| | | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | | POLICY  PRO-JECT  X  LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | | OTHER | | | | | | | $ |
| A | | AUTOMOBILE LIABILITY | | | AS2-Z91-455039-024 | 08/01/2014 | 08/01/2015 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | | ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | | ALL OWNED AUTOS    SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | X | HIRED AUTOS  X  NON-OWNED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | | $ |
| B | X | UMBRELLA LIAB  X  OCCUR | | | TH7-Z91-455039-044 | 08/01/2014 | 08/01/2015 | EACH OCCURRENCE | $ 5,000,000 |
| | | EXCESS LIAB  CLAIMS-MADE | | | | | | AGGREGATE | $ 5,000,000 |
| | | DED    RETENTION $ | | | | | | | $ |
| C | | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY   Y/N | N/A | | WCC-Z91-455039-014 | 08/01/2014 | 08/01/2015 | X  PER STATUTE   OTH-ER | |
| | | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH) | | | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)

RE:1101 Market Street, Philadelphia, PA 19107  LC 04 44 04 12 Additional Insured: Girard Estate Leasehold, a Pennsylvania non-profit corporation; Girard Estate Fee, a Pennsylvania non-profit corporation; Kennedy-Wilson Properties, Ltd; Kennedy-Wilson Pennsylvania Management, Inc.; and their respective partners, members, agents and employees. All coverages are subject to policy terms, conditions & exclusions. Coverage afforded to the additional insureds shall not apply to the sole negligence of the additional insureds.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Aramark Tower<br>Kennedy-Wilson PA Mgmt., Inc.<br>1101 Market Street Suite 105<br>Philadelphia, PA 19107 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.<br><br>AUTHORIZED REPRESENTATIVE<br>*Jean Brandon* |

The ACORD name and logo are registered marks of ACORD        © 1988-2014 ACORD CORPORATION.  All rights reserved.

**ACORD 25 (2014/01)**

Exhibit "D"

## COMMERCIAL GENERAL LIABILITY DECLARATIONS
### OCCURRENCE



Issued By Liberty Mutual Fire Insurance Co.

| | |
|---|---|
| Policy Number  TB2-Z91-455039-034 | Issuing Office  ALISO VIEJO, CA |
| Renewal Of     YVJ-Z91-455039-033 | Issue Date   2014-09-08 |
| Account Number  9-455039 | Sub Account   0001 |

Named Insured and Mailing Address
Farrelly Building Services, Inc
124 Front St Ste 203
Massapequa Park NY 11762

Form of Business: Corporation

Policy Period: The policy period is from 08/01/2014 to 08/01/2015 12:01 A.M. standard time at the Insured's mailing address.

In return for the payment of the premium, and subject to all the terms of this policy, we agree with you to provide the insurance as stated in this policy.

### LIMITS OF INSURANCE

| | | |
|---|---|---|
| Each Occurrence Limit | $    1,000,000 | |
| Damage to Premises Rented to You Limit | $      300,000 | Any one premises |
| Medical Expense Limit | $          5,000 | Any one person |
| Personal & Advertising Injury Limit | $    1,000,000 | |
| General Aggregate Limit | $    2,000,000 | |
| Products-Completed Operations Aggregate Limit | $    2,000,000 | |

### SCHEDULE

The declarations are completed on the accompanying "Declarations Extension Schedule(s)".

| | | |
|---|---|---|
| Commercial General Liability Coverage Part Premium | $ | ▬▬▬ |
| Endorsement Premium | $ | |
| Total Estimated Premium | $ | ▬▬▬ |
| Other Charge(s) | $ | |

Policywriting Minimum Premium  $ 1,000

Forms Applicable: See Attached Inventory

WELLS FA  0073009546
WELLS FARGO INSURANCE SERVICES USA
INC
5901 PRIESTLY DR STE 306

CARLSBAD CA 92008

© 2012 Liberty Mutual Insurance. All rights reserved.
Includes copyrighted material of Insurance Services Office, Inc. with
its permission.

## DECLARATIONS EXTENSION SCHEDULE – CLASSIFICATION DESCRIPTIONS

**Policy Number** TB2-Z91-455039-034

| Class Code | Description |
|---|---|
| 70050 | Services |

© 2012 Liberty Mutual Insurance. All rights reserved.
Includes copyrighted material of Insurance Services Office, Inc. with its permission.

**DECLARATIONS EXTENSION SCHEDULE**
**– COMPOSITE RATED COVERAGES –**

**Policy Number  TB2-Z91-455039-034**

| Description | Premium Basis | Rates | Premium |
|---|---|---|---|
| GL Payroll | Payroll | | |

**TOTAL**

© 2012 Liberty Mutual Insurance. All rights reserved.
Includes copyrighted material of Insurance Services Office, Inc. with
its permission.

## DECLARATIONS EXTENSION SCHEDULE
## MISCELLANEOUS CHARGES

Policy Number  TB2-Z91-455039-034

| | Premium Basis | Rates | Charges |
|---|---|---|---|
| Terrorism Risk Insurance Act (TRIA) | | | |
| **TOTAL MISCELLANEOUS CHARGES** | | | |

© 2012 Liberty Mutual Insurance. All rights reserved.
Includes copyrighted material of Insurance Services Office, Inc. with
its permission.

Policy Number TB2-Z91-455039-034
Issued by Liberty Mutual Fire Insurance Co.

## Inventory
## Coverage Forms/Parts, Endorsements, Enclosures

COVERAGE FORMS/PARTS, ENDORSEMENTS AND ENCLOSURES FORMING A PART OF THIS POLICY AT INCEPTION:

| Form Number/Edition Date | Title |
|---|---|
| **COMMON POLICY FORMS** | |
| LIL 90 06 10 13 | ANNUAL MEETING NOTICE |
| LC 00 04 08 12 | COMMERCIAL GENERAL LIABILITY DECLARATIONS |
| LCS 00 01 05 12 | DECLARATIONS EXTENSION SCHEDULE - CLASSIFICATION DESCRIPTIONS |
| LCS 00 02 05 12 | DECLARATIONS EXTENSION SCHEDULE |
| LCS 00 03 05 12 | DECLARATIONS EXTENSION SCHEDULE MISCELLANEOUS CHARGES |
| IC 00 42 07 09 | Inventory Coverage Forms/Parts, Endorsements, Enclosures |
| IL 00 17 11 98 | Common Policy Conditions |
| IL 02 68 01 11 | New York Changes - Cancellation and Nonrenewal |
| IL 09 10 07 02 | Pennsylvania Notice |

| | |
|---|---|
| **COMMERCIAL GENERAL LIABILITY** | |
| CG 00 01 04 13 | COMMERCIAL GENERAL LIABILITY COVERAGE FORM |
| **Composite Rate** | |
| LC 99 24 03 06 | Composite Rate Endorsement |
| **Coverage Endorsement(s)** | |
| CG 24 26 04 13 | AMENDMENT OF INSURED CONTRACT DEFINITION |
| LC 29 04 08 08 | Personal and Advertising Injury - Definition of Publication |
| LG 20 66 01 93 | Amendment New York Employee Benefits Liability Insurance Endorsement This is a Claims Made Coverage |
| LC 29 08 10 11 | Advertisement Redefined |
| LG 32 05 06 05 | Damage First Occurring Prior to Policy Period - Exclusion |
| LC 25 19 10 13 | Designated Construction Project Or Designated Location Combined Aggregate Limits-With Total Project and Location Aggregate Limit |
| LC 04 44 04 12 | Commercial General Liability Enhancement For Janitorial Contractors |
| LG 32 64 09 07 | Amendment - Premium Responsibility |
| GL1016 04 06 | New York Disclosure and Notice Requirements |
| **TRIA Exclusion(s)** | |
| CG 21 70 01 08 | Cap On Losses From Certified Acts of Terrorism |
| CG 21 76 01 08 | Exclusion of Punitive Damages Related to a Certified Act of Terrorism |

IC 00 42 07 09            © 2008. Liberty Mutual Group of Companies.  All rights reserved.            Page 1 of 2

| Form Number/Edition Date | Title |
|---|---|
| CG 21 88 01 07 | CONDITIONAL EXCLUSION OF TERRORISM INVOLVING NUCLEAR, BIOLOGICAL OR CHEMICAL TERRORISM (RELATING TO DISPOSITION OF FEDERAL TERRORISM RISK INSURANCE ACT) |
| CG 26 86 01 08 | Arkansas Exclusion of Punitive Damages Related to a Certified Act of Terrorism |
| CG 26 93 01 08 | Alaska Exclusion of Punitive Damages Related to a Certified Act of Terrorism |
| CG 32 15 01 07 | ALASKA CONDITIONAL EXCLUSION OF TERRORISM INVOLVING NUCLEAR, BIOLOGICAL OR CHEMICAL TERRORISM (RELATING TO DISPOSITION OF FEDERAL TERRORISM RISK INSURANCE ACT) |
| CG 32 21 01 07 | WASHINGTON CONDITIONAL EXCLUSION OF TERRORISM INVOLVING NUCLEAR, BIOLOGICAL OR CHEMICAL TERRORISM (RELATING TO DISPOSITION OF FEDERAL TERRORISM RISK INSURANCE ACT) |

**Other Exclusion(s)**

| | |
|---|---|
| CG 21 46 07 98 | Abuse Or Molestation Exclusion |
| CG 21 47 12 07 | Employment-Related Practices Exclusion |
| CG 21 49 09 99 | Total Pollution Exclusion Endorsement |
| IL 00 23 07 02 | Nuclear Energy Liability Exclusion Endorsement (Broad Form) |
| LC 21 04 06 05 | Discrimination Exclusion |
| LC 21 05 06 07 | Aircraft Products Exclusion |
| LC 21 64 08 07 | Land or Earth Movement Exclusion |
| LC 21 68 08 07 | Residential Construction Operations Exclusion |
| LC 32 41 06 05 | New York - Asbestos Exclusion Endorsement |
| LC 32 83 06 05 | New York Silica Exclusion Endorsement |
| LC 21 27 10 11 | Intercompany Products Exclusion |
| GL2125 07 98 | Lead Exclusion Endorsement |

**State Mandatory**

| | |
|---|---|
| CG 01 04 12 04 | New York Changes - Premium Audit |
| CG 01 63 07 11 | New York Changes Commercial General Liability Coverage Form |
| CG 26 21 10 91 | New York Changes - Transfer of Duties When a Limit of Insurance is Used Up |
| ST2000 03 87 | Important Notice To Policyholders |
| CNI 90 06 0512 | Notice of Renewal |

**NOTICE(S) TO POLICYHOLDER**

| | |
|---|---|
| CNI 90 07 01 14 | IMPORTANT NOTICE REGARDING THE EXPIRATION OF THE TERRORISM RISK INSURANCE ACT AND THE REDUCTION IN COVERAGE FOR TERRORISM LOSSES |
| EN 90 48 07 09 | Disclosure - Terrorism Risk Insurance Act |
| LG 32 06 11 05 | Premium Determination - Subcontractors |
| SNL 90 04 10 13 | LIBERALIZATION NOTICE |

 © 2008, Liberty Mutual Group of Companies. All rights reserved.

## Common Policy Conditions

All Coverage Parts included in this policy are subject to the following conditions:

### A. CANCELLATION

1. The First Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

   b. 30 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is canceled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

### B. CHANGES

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

### C. EXAMINATION OF YOUR BOOKS AND RECORDS

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

### D. INSPECTIONS AND SURVEYS

1. We have the right to:

   a. Make inspections and surveys at any time;

   b. Give you reports on the conditions we find; and

   c. Recommend changes.

2. We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

   a. Are safe or healthful; or

Copyright, Insurance Services Office, Inc., 1998

   b.  Comply with laws, regulations, codes or standards.

3.  Paragraphs 1. and 2. of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

4.  Paragraph 2. of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

## E.  PREMIUMS

The first Named Insured shown in the Declarations:

1.  Is responsible for the payment of all premiums; and

2.  Will be the payee for any return premiums we pay.

## F.  TRANSFER OF YOUR RIGHTS AND DUTIES UNDER THIS POLICY

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

IL 02 68 01 11

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# NEW YORK CHANGES – CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

CAPITAL ASSETS PROGRAM (OUTPUT POLICY) COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
CRIME AND FIDELITY COVERAGE PART
EQUIPMENT BREAKDOWN COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

A. Paragraphs 1., 2., 3. and 5. of the Cancellation Common Policy Condition are replaced by the following:

1. The first Named Insured shown in the Declarations may cancel this entire policy by mailing or delivering to us advance written notice of cancellation.

2. Cancellation Of Policies In Effect

   a. 60 Days Or Less

   We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   (1) 30 days before the effective date of cancellation if we cancel for any reason not included in Paragraph A.2.a.(2) below.

   (2) 15 days before the effective date of cancellation if we cancel for any of the following reasons:

   (a) Nonpayment of premium, provided however, that a notice of cancellation on this ground shall inform the first Named Insured of the amount due;

   (b) Conviction of a crime arising out of acts increasing the hazard insured against;

   (c) Discovery of fraud or material misrepresentation in the obtaining of the policy or in the presentation of a claim;

   (d) After issuance of the policy or after the last renewal date, discovery of an act or omission, or a violation of any policy condition, that substantially and materially increases the hazard insured against, and that occurred subsequent to inception of the current policy period;

   (e) Material physical change in the property insured, occurring after issuance or last annual renewal anniversary date of the policy, that results in the property becoming uninsurable in accordance with our objective, uniformly applied underwriting standards in effect at the time the policy was issued or last renewed; or material change in the nature or extent of the risk, occurring after issuance or last annual renewal anniversary date of the policy, that causes the risk of loss to be substantially and materially increased beyond that contemplated at the time the policy was issued or last renewed;

   (f) Required pursuant to a determination by the Superintendent that continuation of our present premium volume would jeopardize our solvency or be hazardous to the interest of our policyholders, our creditors or the public;

© Insurance Services Office, Inc., 2010

(g) A determination by the Superintendent that the continuation of the policy would violate, or would place us in violation of, any provision of the Insurance Code; or

(h) Where we have reason to believe, in good faith and with sufficient cause, that there is a probable risk of danger that the insured will destroy, or permit to be destroyed, the insured property for the purpose of collecting the insurance proceeds. If we cancel for this reason, you may make a written request to the Insurance Department, within 10 days of receipt of this notice, to review our cancellation decision. Also, we will simultaneously send a copy of this cancellation notice to the Insurance Department.

b. For More Than 60 Days

If this policy has been in effect for more than 60 days, or if this policy is a renewal or continuation of a policy we issued, we may cancel only for any of the reasons listed in Paragraph A.2.a.(2) above, provided:

(1) We mail the first Named Insured written notice at least 15 days before the effective date of cancellation; and

(2) If we cancel for nonpayment of premium, our notice of cancellation informs the first Named Insured of the amount due.

3. We will mail or deliver our notice, including the reason for cancellation, to the first Named Insured at the address shown in the policy and to the authorized agent or broker.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata.

However, when the premium is advanced under a premium finance agreement, the cancellation refund will be pro rata. Under such financed policies, we will be entitled to retain a minimum earned premium of 10% of the total policy premium or $60, whichever is greater. The cancellation will be effective even if we have not made or offered a refund.

B. The following is added to the Cancellation Common Policy Condition:

7. If one of the reasons for cancellation in Paragraph A.2.a.(2) or D.2.b.(2) exists, we may cancel this entire policy, even if the reason for cancellation pertains only to a new coverage or endorsement initially effective subsequent to the original issuance of this policy.

C. The following conditions are added:

1. Nonrenewal

If we decide not to renew this policy we will send notice as provided in Paragraph C.3. below.

2. Conditional Renewal

If we conditionally renew this policy subject to:

a. A change of limits;

b. A change in type of coverage;

c. A reduction of coverage;

d. An increased deductible;

e. An addition of exclusion; or

f. Increased premiums in excess of 10%, exclusive of any premium increase due to and commensurate with insured value added or increased exposure units; or as a result of experience rating, loss rating, retrospective rating or audit;

we will send notice as provided in Paragraph C.3. below.

3. Notices Of Nonrenewal And Conditional Renewal

a. If we decide not to renew this policy or to conditionally renew this policy as provided in Paragraphs C.1. and C.2. above, we will mail or deliver written notice to the first Named Insured shown in the Declarations at least 60 but not more than 120 days before:

(1) The expiration date; or

(2) The anniversary date if this is a continuous policy.

b. Notice will be mailed or delivered to the first Named Insured at the address shown in the policy and to the authorized agent or broker. If notice is mailed, proof of mailing will be sufficient proof of notice.

© Insurance Services Office, Inc., 2010     IL 02 68 01 11

c. Notice will include the specific reason(s) for nonrenewal or conditional renewal, including the amount of any premium increase for conditional renewal and description of any other changes.

d. If we violate any of the provisions of Paragraph C.3.a., b. or c. above by sending the first Named Insured an incomplete or late conditional renewal notice or a late nonrenewal notice:

(1) And if notice is provided prior to the expiration date of this policy, coverage will remain in effect at the same terms and conditions of this policy at the lower of the current rates or the prior period's rates until 60 days after such notice is mailed or delivered, unless the first Named Insured, during this 60-day period, has replaced the coverage or elects to cancel;

(2) And if the notice is provided on or after the expiration date of this policy, coverage will remain in effect at the same terms and conditions of this policy for another policy period, at the lower of the current rates or the prior period's rates, unless the first Named Insured, during this additional policy period, has replaced the coverage or elects to cancel.

e. If you elect to renew on the basis of a late conditional renewal notice, the terms, conditions and rates set forth in such notice shall apply:

(1) Upon expiration of the 60-day period, unless Subparagraph (2) below applies; or

(2) Notwithstanding the provisions in Paragraphs d.(1) and d.(2), as of the renewal date of the policy if the conditional renewal notice was sent at least 30 days prior to the expiration or anniversary date of the policy.

f. We will not send you notice of nonrenewal or conditional renewal if you, your authorized agent or broker or another insurer of yours mails or delivers notice that the policy has been replaced or is no longer desired.

D. The following provisions apply when the Commercial Property Coverage Part, the Farm Coverage Part or the Capital Assets Program (Output Policy) Coverage Part is made a part of this policy:

1. Items D.2. and D.3. apply if this policy meets the following conditions:

a. The policy is issued or issued for delivery in New York State covering property located in this state; and

b. The policy insures:

(1) For loss of or damage to structures, other than hotels or motels, used predominantly for residential purposes and consisting of no more than four dwelling units; or

(2) For loss of or damage to personal property other than farm personal property or business property; or

(3) Against damages arising from liability for loss of, damage to or injury to persons or property, except liability arising from business or farming; and

c. The portion of the annual premium attributable to the property and contingencies described in 1.b. exceeds the portion applicable to other property and contingencies.

2. Paragraph 2. of the Cancellation Common Policy Condition is replaced by the following:

2. Procedure And Reasons For Cancellation

a. We may cancel this entire policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

(1) 15 days before the effective date of cancellation if we cancel for nonpayment of premium, provided however, that a notice of cancellation on this ground shall inform the first Named Insured of the amount due; or

(2) 30 days before the effective date of cancellation if we cancel for any other reason.

b. But if this policy:

(1) Has been in effect for more than 60 days; or

(2) Is a renewal of a policy we issued;

we may cancel this policy only for one or more of the following reasons:

(1) Nonpayment of premium, provided however, that a notice of cancellation on this ground shall inform the first Named Insured of the amount due;

(2) Conviction of a crime arising out of acts increasing the risk of loss;

(3) Discovery of fraud or material misrepresentation in obtaining the policy or in making a claim;

(4) Discovery of willful or reckless acts or omissions increasing the risk of loss;

(5) Physical changes in the covered property that make that property uninsurable in accordance with our objective and uniformly applied underwriting standards in effect when we:

(a) Issued the policy; or

(b) Last voluntarily renewed the policy;

(6) The Superintendent of Insurance's determination that continuing the policy would violate Chapter 28 of the Insurance Law; or

(7) Required pursuant to a determination by the Superintendent of Insurance that the continuation of our present premium volume would be hazardous to the interests of our policyholders, our creditors or the public.

3. The following are added:

a. Conditional Continuation

Instead of cancelling this policy, we may continue it on the condition that:

(1) The policy limits be changed; or

(2) Any coverage not required by law be eliminated.

If this policy is conditionally continued, we will mail or deliver to the first Named Insured written notice at least 20 days before the effective date of the change or elimination. We will mail or deliver our notice to the first Named Insured's last mailing address known to us. If notice is mailed, proof of mailing will be sufficient proof of notice. Delivery of the notice will be the same as mailing.

b. Nonrenewal

If, as allowed by the laws of New York State, we:

(1) Do not renew this policy; or

(2) Condition policy renewal upon:

(a) Change of limits; or

(b) Elimination of coverage;

we will mail or deliver written notice of nonrenewal or conditional renewal:

(a) At least 45 days; but

(b) Not more than 60 days;

before the expiration date of the policy. We will mail or deliver our notice to the first Named Insured's last mailing address known to us. If notice is mailed, proof of mailing will be sufficient proof of notice. Delivery of the notice will be the same as mailing.

E. The following is added to the Farm Property – Other Farm Provisions Form – Additional Coverages, Conditions, Definitions, the Commercial Property Coverage Part and the Capital Assets Program (Output Policy) Coverage Part:

When the property is subject to the Anti-arson Application in accordance with New York Insurance Department Regulation No. 96, the following provisions are added:

If you fail to return the completed, signed and affirmed anti-arson application to us:

1. Or our broker or agent within 45 days of the effective date of a new policy, we will cancel the entire policy by giving 20 days' written notice to you and to the mortgageholder shown in the Declarations.

2. Before the expiration date of any policy, we will cancel the policy by giving written notice to you and to the mortgageholder shown in the Declarations at least 15 days before the effective date of cancellation.

The cancellation provisions set forth in E.1. and E.2. above supersede any contrary provisions in this policy including this endorsement.

If the notice in E.1. or E.2. above is mailed, proof of mailing will be sufficient proof of notice. Delivery of the notice will be the same as mailing.

© Insurance Services Office, Inc., 2010

IL 02 58 01 11

F. The following applies to the Commercial Property Coverage Part, the Farm Coverage Part and the Capital Assets Program (Output Policy) Coverage Part:

Paragraphs f. and g. of the Mortgageholders Condition are replaced by the following:

f. Cancellation

(1) If we cancel this policy, we will give written notice to the mortgageholder at least:

(a) 10 days before the effective date of cancellation if we cancel for your nonpayment of premium; or

(b) 30 days before the effective date of cancellation if we cancel for any other reason.

(2) If you cancel this policy, we will give written notice to the mortgageholder. With respect to the mortgageholder's interest only, cancellation will become effective on the later of:

(a) The effective date of cancellation of the insured's coverage; or

(b) 10 days after we give notice to the mortgageholder.

g. Nonrenewal

(1) If we elect not to renew this policy, we will give written notice to the mortgageholder at least 10 days before the expiration date of this policy.

(2) If you elect not to renew this policy, we will give written notice to the mortgageholder. With respect to the mortgageholder's interest only, nonrenewal will become effective on the later of:

(a) The expiration date of the policy; or

(b) 10 days after we give notice to the mortgageholder.

G. The following provisions apply when the following are made a part of this policy:

Commercial General Liability Coverage Part

Employment-Related Practices Liability Coverage Part

Farm Liability Coverage Form

Liquor Liability Coverage Part

Products/Completed Operations Liability Coverage Part

1. The aggregate limits of this policy as shown in the Declarations will be increased in proportion to any policy extension provided in accordance with Paragraph C.3.d. above.

2. The last sentence of Limits Of Insurance does not apply when the policy period is extended because we sent the first Named Insured an incomplete or late conditional renewal notice or a late nonrenewal notice.

IL 09 10 07 02

# PENNSYLVANIA NOTICE

An Insurance Company, its agents, employees, or service contractors acting on its behalf, may provide services to reduce the likelihood of injury, death or loss. These services may include any of the following or related services incident to the application for, issuance, renewal or continuation of, a policy of insurance:

1. Surveys;

2. Consultation or advice; or

3. Inspections.

The "Insurance Consultation Services Exemption Act" of Pennsylvania provides that the Insurance Company, its agents, employees or service contractors acting on its behalf, is not liable for damages from injury, death or loss occurring as a result of any act or omission by any person in the furnishing of or the failure to furnish these services.

The Act does not apply:

1. If the injury, death or loss occurred during the actual performance of the services and was caused by the negligence of the Insurance Company, its agents, employees or service contractors;

2. To consultation services required to be performed under a written service contract not related to a policy of insurance; or

3. If any acts or omissions of the Insurance Company, its agents, employees or service contractors are judicially determined to constitute a crime, actual malice, or gross negligence.

---

**Instruction to Policy Writers**

Attach the Pennsylvania Notice to all new and renewal certificates insuring risks located in Pennsylvania.

---

# COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section II – Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section V – Definitions.

## SECTION I – COVERAGES

## COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1. Insuring Agreement

   a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

      (1) The amount we will pay for damages is limited as described in Section III – Limits Of Insurance; and

      (2) Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

      No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages A and B.

   b. This insurance applies to "bodily injury" and "property damage" only if:

      (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

      (2) The "bodily injury" or "property damage" occurs during the policy period; and

      (3) Prior to the policy period, no insured listed under Paragraph 1. of Section II – Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

   c. "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph 1. of Section II – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

   d. "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph 1. of Section II – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

      (1) Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

      (2) Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

      (3) Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

   e. Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

 © Insurance Services Office, Inc., 2012

**2. Exclusions**

This insurance does not apply to:

**a. Expected Or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

**b. Contractual Liability**

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

(1) That the insured would have in the absence of the contract or agreement; or

(2) Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorneys' fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

(a) Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

(b) Such attorneys' fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

**c. Liquor Liability**

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

(1) Causing or contributing to the intoxication of any person;

(2) The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

(3) Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in:

(a) The supervision, hiring, employment, training or monitoring of others by that insured; or

(b) Providing or failing to provide transportation with respect to any person that may be under the influence of alcohol;

if the "occurrence" which caused the "bodily injury" or "property damage", involved that which is described in Paragraph (1), (2) or (3) above.

However, this exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages. For the purposes of this exclusion, permitting a person to bring alcoholic beverages on your premises, for consumption on your premises, whether or not a fee is charged or a license is required for such activity, is not by itself considered the business of selling, serving or furnishing alcoholic beverages.

**d. Workers' Compensation And Similar Laws**

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

**e. Employer's Liability**

"Bodily injury" to:

(1) An "employee" of the insured arising out of and in the course of:

(a) Employment by the insured; or

(b) Performing duties related to the conduct of the insured's business; or

(2) The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph (1) above.

This exclusion applies whether the insured may be liable as an employer or in any other capacity and to any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

© Insurance Services Office, Inc., 2012 CG 00 01 04 13

25420140011410019

**f. Pollution**

(1) "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

(a) At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, this subparagraph does not apply to:

(i) "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests;

(ii) "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

(iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

(b) At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

(c) Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:

(i) Any insured; or

(ii) Any person or organization for whom you may be legally responsible; or

(d) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:

(i) "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

(ii) "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

(iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire".

(e) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

(2) Any loss, cost or expense arising out of any:

(a) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

(b) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or "suit" by or on behalf of a governmental authority.

g. Aircraft, Auto Or Watercraft

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

This exclusion does not apply to:

(1) A watercraft while ashore on premises you own or rent;

(2) A watercraft you do not own that is:

(a) Less than 26 feet long; and

(b) Not being used to carry persons or property for a charge;

(3) Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

(4) Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

(5) "Bodily injury" or "property damage" arising out of:

(a) The operation of machinery or equipment that is attached to, or part of, a land vehicle that would qualify under the definition of "mobile equipment" if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged; or

(b) The operation of any of the machinery or equipment listed in Paragraph f.(2) or f.(3) of the definition of "mobile equipment".

h. Mobile Equipment

"Bodily injury" or "property damage" arising out of:

(1) The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

(2) The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

i. War

"Bodily injury" or "property damage", however caused, arising, directly or indirectly, out of:

(1) War, including undeclared or civil war;

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

j. Damage To Property

"Property damage" to:

(1) Property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

(2) Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

(3) Property loaned to you;

© Insurance Services Office, Inc., 2012

(4) Personal property in the care, custody or control of the insured;

(5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

(6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraphs (1), (3) and (4) of this exclusion do not apply to "property damage" (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of seven or fewer consecutive days. A separate limit of insurance applies to Damage To Premises Rented To You as described in Section III – Limits Of Insurance.

Paragraph (2) of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs (3), (4), (5) and (6) of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

k. Damage To Your Product

"Property damage" to "your product" arising out of it or any part of it.

l. Damage To Your Work

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

m. Damage To Impaired Property Or Property Not Physically Injured

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

(1) A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

(2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

n. Recall Of Products, Work Or Impaired Property

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

(1) "Your product";

(2) "Your work"; or

(3) "Impaired property";

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

o. Personal And Advertising Injury

"Bodily injury" arising out of "personal and advertising injury".

p. Electronic Data

Damages arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

However, this exclusion does not apply to liability for damages because of "bodily injury".

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

q. Recording And Distribution Of Material Or Information In Violation Of Law

"Bodily injury" or "property damage" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

(1) The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

(2) The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

(3) The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transactions Act (FACTA); or

(4) Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

Exclusions c. through n. do not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in Section III – Limits Of Insurance.

## COVERAGE B – PERSONAL AND ADVERTISING INJURY LIABILITY

1. Insuring Agreement

    a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. But:

        (1) The amount we will pay for damages is limited as described in Section III – Limits Of Insurance; and

        (2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

    No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages A and B.

    b. This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

2. Exclusions

    This insurance does not apply to:

    a. Knowing Violation Of Rights Of Another

        "Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

    b. Material Published With Knowledge Of Falsity

        "Personal and advertising injury" arising out of oral or written publication, in any manner, of material, if done by or at the direction of the insured with knowledge of its falsity.

    c. Material Published Prior To Policy Period

        "Personal and advertising injury" arising out of oral or written publication, in any manner, of material whose first publication took place before the beginning of the policy period.

    d. Criminal Acts

        "Personal and advertising injury" arising out of a criminal act committed by or at the direction of the insured.

    e. Contractual Liability

        "Personal and advertising injury" for which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.

    f. Breach Of Contract

        "Personal and advertising injury" arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement".

    g. Quality Or Performance Of Goods – Failure To Conform To Statements

        "Personal and advertising injury" arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement".

    h. Wrong Description Of Prices

        "Personal and advertising injury" arising out of the wrong description of the price of goods, products or services stated in your "advertisement".

© Insurance Services Office, Inc., 2012   CG 00 01 04 13

i. Infringement Of Copyright, Patent, Trademark Or Trade Secret

"Personal and advertising injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights. Under this exclusion, such other intellectual property rights do not include the use of another's advertising idea in your "advertisement".

However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan.

j. Insureds In Media And Internet Type Businesses

"Personal and advertising injury" committed by an insured whose business is:

(1) Advertising, broadcasting, publishing or telecasting;

(2) Designing or determining content of web sites for others; or

(3) An Internet search, access, content or service provider.

However, this exclusion does not apply to Paragraphs 14.a., b. and c. of "personal and advertising injury" under the Definitions section.

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

k. Electronic Chatrooms Or Bulletin Boards

"Personal and advertising injury" arising out of an electronic chatroom or bulletin board the insured hosts, owns, or over which the insured exercises control.

l. Unauthorized Use Of Another's Name Or Product

"Personal and advertising injury" arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers.

m. Pollution

"Personal and advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

n. Pollution-related

Any loss, cost or expense arising out of any:

(1) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

(2) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

o. War

"Personal and advertising injury", however caused, arising, directly or indirectly, out of:

(1) War, including undeclared or civil war;

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

p. Recording And Distribution Of Material Or Information In Violation Of Law

"Personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

(1) The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

(2) The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

(3) The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transactions Act (FACTA); or

(4) Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

**COVERAGE C – MEDICAL PAYMENTS**

**1. Insuring Agreement**

a. We will pay medical expenses as described below for "bodily injury" caused by an accident:

(1) On premises you own or rent;

(2) On ways next to premises you own or rent; or

(3) Because of your operations;

provided that:

(a) The accident takes place in the "coverage territory" and during the policy period;

(b) The expenses are incurred and reported to us within one year of the date of the accident; and

(c) The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

b. We will make these payments regardless of fault. These payments will not exceed the applicable limit of insurance. We will pay reasonable expenses for:

(1) First aid administered at the time of an accident;

(2) Necessary medical, surgical, X-ray and dental services, including prosthetic devices; and

(3) Necessary ambulance, hospital, professional nursing and funeral services.

**2. Exclusions**

We will not pay expenses for "bodily injury":

a. Any Insured

To any insured, except "volunteer workers".

b. Hired Person

To a person hired to do work for or on behalf of any insured or a tenant of any insured.

c. Injury On Normally Occupied Premises

To a person injured on that part of premises you own or rent that the person normally occupies.

d. Workers' Compensation And Similar Laws

To a person, whether or not an "employee" of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or a similar law.

e. Athletics Activities

To a person injured while practicing, instructing or participating in any physical exercises or games, sports, or athletic contests.

f. Products-Completed Operations Hazard

Included within the "products-completed operations hazard".

g. Coverage A Exclusions

Excluded under Coverage A.

**SUPPLEMENTARY PAYMENTS – COVERAGES A AND B**

1. We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

a. All expenses we incur.

b. Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

c. The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

d. All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $250 a day because of time off from work.

e. All court costs taxed against the insured in the "suit". However, these payments do not include attorneys' fees or attorneys' expenses taxed against the insured.

f. Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

 © Insurance Services Office, Inc., 2012

g. All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

2. If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

a. The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

b. This insurance applies to such liability assumed by the insured;

c. The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

d. The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

e. The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

f. The indemnitee:

(1) Agrees in writing to:

(a) Cooperate with us in the investigation, settlement or defense of the "suit";

(b) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

(c) Notify any other insurer whose coverage is available to the indemnitee; and

(d) Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

(2) Provides us with written authorization to:

(a) Obtain records and other information related to the "suit"; and

(b) Conduct and control the defense of the indemnitee in such "suit".

So long as the above conditions are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph 2.b.(2) of Section I – Coverage A – Bodily Injury And Property Damage Liability, such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the limits of insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when we have used up the applicable limit of insurance in the payment of judgments or settlements or the conditions set forth above, or the terms of the agreement described in Paragraph f. above, are no longer met.

## SECTION II – WHO IS AN INSURED

1. If you are designated in the Declarations as:

a. An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

b. A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

c. A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

d. An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

e. A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

         © Insurance Services Office, Inc., 2012

2. Each of the following is also an insured:

  a. Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" or "volunteer workers" are insureds for:

    (1) "Bodily injury" or "personal and advertising injury":

      (a) To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), to a co-"employee" while in the course of his or her employment or performing duties related to the conduct of your business, or to your other "volunteer workers" while performing duties related to the conduct of your business;

      (b) To the spouse, child, parent, brother or sister of that co-"employee" or "volunteer worker" as a consequence of Paragraph (1)(a) above;

      (c) For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraph (1)(a) or (b) above; or

      (d) Arising out of his or her providing or failing to provide professional health care services.

    (2) "Property damage" to property:

      (a) Owned, occupied or used by;

      (b) Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by;

      you, any of your "employees", "volunteer workers", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

  b. Any person (other than your "employee" or "volunteer worker"), or any organization while acting as your real estate manager.

  c. Any person or organization having proper temporary custody of your property if you die, but only:

    (1) With respect to liability arising out of the maintenance or use of that property; and

    (2) Until your legal representative has been appointed.

  d. Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

3. Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

  a. Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

  b. Coverage A does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

  c. Coverage B does not apply to "personal and advertising injury" arising out of an offense committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

**SECTION III – LIMITS OF INSURANCE**

1. The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

  a. Insureds;

  b. Claims made or "suits" brought; or

  c. Persons or organizations making claims or bringing "suits".

2. The General Aggregate Limit is the most we will pay for the sum of:

  a. Medical expenses under Coverage C;

  b. Damages under Coverage A, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

  c. Damages under Coverage B.

 © Insurance Services Office, Inc., 2012 CG 00 01 04 13

3. The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage A for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard".

4. Subject to Paragraph 2. above, the Personal And Advertising Injury Limit is the most we will pay under Coverage B for the sum of all damages because of all "personal and advertising injury" sustained by any one person or organization.

5. Subject to Paragraph 2. or 3. above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:

   a. Damages under Coverage A; and

   b. Medical expenses under Coverage C

   because of all "bodily injury" and "property damage" arising out of any one "occurrence".

6. Subject to Paragraph 5. above, the Damage To Premises Rented To You Limit is the most we will pay under Coverage A for damages because of "property damage" to any one premises, while rented to you, or in the case of damage by fire, while rented to you or temporarily occupied by you with permission of the owner.

7. Subject to Paragraph 5. above, the Medical Expense Limit is the most we will pay under Coverage C for all medical expenses because of "bodily injury" sustained by any one person.

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

**SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS**

1. **Bankruptcy**

   Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

2. **Duties In The Event Of Occurrence, Offense, Claim Or Suit**

   a. You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

      (1) How, when and where the "occurrence" or offense took place;

      (2) The names and addresses of any injured persons and witnesses; and

      (3) The nature and location of any injury or damage arising out of the "occurrence" or offense.

   b. If a claim is made or "suit" is brought against any insured, you must:

      (1) Immediately record the specifics of the claim or "suit" and the date received; and

      (2) Notify us as soon as practicable.

      You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

   c. You and any other involved insured must:

      (1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

      (2) Authorize us to obtain records and other information;

      (3) Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

      (4) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

   d. No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

3. **Legal Action Against Us**

   No person or organization has a right under this Coverage Part:

   a. To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

   b. To sue us on this Coverage Part unless all of its terms have been fully complied with.

   A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

 © Insurance Services Office, Inc., 2012

## 4. Other Insurance

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages A or B of this Coverage Part, our obligations are limited as follows:

### a. Primary Insurance

This insurance is primary except when Paragraph b. below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in Paragraph c. below.

### b. Excess Insurance

(1) This insurance is excess over:

(a) Any of the other insurance, whether primary, excess, contingent or on any other basis:

(i) That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

(ii) That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner;

(iii) That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner; or

(iv) If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion g. of Section I – Coverage A – Bodily Injury And Property Damage Liability.

(b) Any other primary insurance available to you covering liability for damages arising out of the premises or operations, or the products and completed operations, for which you have been added as an additional insured.

(2) When this insurance is excess, we will have no duty under Coverages A or B to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

(3) When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

(a) The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

(b) The total of all deductible and self-insured amounts under all that other insurance.

(4) We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

### c. Method Of Sharing

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

## 5. Premium Audit

a. We will compute all premiums for this Coverage Part in accordance with our rules and rates.

b. Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit and retrospective premiums is the date shown as the due date on the bill. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

c. The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

## 6. Representations

By accepting this policy, you agree:

a. The statements in the Declarations are accurate and complete;

© Insurance Services Office, Inc., 2012

b. Those statements are based upon representations you made to us; and

c. We have issued this policy in reliance upon your representations.

**7. Separation Of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

a. As if each Named Insured were the only Named Insured; and

b. Separately to each insured against whom claim is made or "suit" is brought.

**8. Transfer Of Rights Of Recovery Against Others To Us**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

**9. When We Do Not Renew**

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

**SECTION V – DEFINITIONS**

1. "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

   a. Notices that are published include material placed on the Internet or on similar electronic means of communication; and

   b. Regarding web sites, only that part of a web site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

2. "Auto" means:

   a. A land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment; or

   b. Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged.

However, "auto" does not include "mobile equipment".

3. "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

4. "Coverage territory" means:

   a. The United States of America (including its territories and possessions), Puerto Rico and Canada;

   b. International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in Paragraph a. above; or

   c. All other parts of the world if the injury or damage arises out of:

      (1) Goods or products made or sold by you in the territory described in Paragraph a. above;

      (2) The activities of a person whose home is in the territory described in Paragraph a. above, but is away for a short time on your business; or

      (3) "Personal and advertising injury" offenses that take place through the Internet or similar electronic means of communication;

   provided the insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in Paragraph a. above or in a settlement we agree to.

5. "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

6. "Executive officer" means a person holding any of the officer positions created by your charter, constitution, bylaws or any other similar governing document.

7. "Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

8. "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

   a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

   b. You have failed to fulfill the terms of a contract or agreement;

   if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement.

© Insurance Services Office, Inc., 2012

9. "Insured contract" means:

a. A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

b. A sidetrack agreement;

c. Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

d. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

e. An elevator maintenance agreement;

f. That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph f. does not include that part of any contract or agreement:

(1) That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

(2) That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

(a) Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

(b) Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

(3) Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in (2) above and supervisory, inspection, architectural or engineering activities.

10. "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

11. "Loading or unloading" means the handling of property:

a. After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

b. While it is in or on an aircraft, watercraft or "auto"; or

c. While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

12. "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

a. Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

b. Vehicles maintained for use solely on or next to premises you own or rent;

c. Vehicles that travel on crawler treads;

d. Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

(1) Power cranes, shovels, loaders, diggers or drills; or

(2) Road construction or resurfacing equipment such as graders, scrapers or rollers;

e. Vehicles not described in Paragraph a., b., c. or d. above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

(1) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

(2) Cherry pickers and similar devices used to raise or lower workers;

f. Vehicles not described in Paragraph a., b., c. or d. above maintained primarily for purposes other than the transportation of persons or cargo.

© Insurance Services Office, Inc., 2012

CG 00 01 04 13

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

(1) Equipment designed primarily for:

   (a) Snow removal;

   (b) Road maintenance, but not construction or resurfacing; or

   (c) Street cleaning;

(2) Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

(3) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

However, "mobile equipment" does not include any land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered "autos".

13. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

14. "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

a. False arrest, detention or imprisonment;

b. Malicious prosecution;

c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

d. Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

e. Oral or written publication, in any manner, of material that violates a person's right of privacy;

f. The use of another's advertising idea in your "advertisement"; or

g. Infringing upon another's copyright, trade dress or slogan in your "advertisement".

15. "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

16. "Products-completed operations hazard":

a. Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

(1) Products that are still in your physical possession; or

(2) Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

   (a) When all of the work called for in your contract has been completed.

   (b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

   (c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

b. Does not include "bodily injury" or "property damage" arising out of:

(1) The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

(2) The existence of tools, uninstalled equipment or abandoned or unused materials; or

(3) Products or operations for which the classification, listed in the Declarations or in a policy Schedule, states that products-completed operations are subject to the General Aggregate Limit.

17. "Property damage" means:

a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

18. "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

   a. An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

   b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

19. "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

20. "Volunteer worker" means a person who is not your "employee", and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

21. "Your product":

   a. Means:

      (1) Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

         (a) You;

         (b) Others trading under your name; or

         (c) A person or organization whose business or assets you have acquired; and

      (2) Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

   b. Includes:

      (1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

      (2) The providing of or failure to provide warnings or instructions.

   c. Does not include vending machines or other property rented to or located for the use of others but not sold.

22. "Your work":

   a. Means:

      (1) Work or operations performed by you or on your behalf; and

      (2) Materials, parts or equipment furnished in connection with such work or operations.

   b. Includes:

      (1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

      (2) The providing of or failure to provide warnings or instructions.

© Insurance Services Office, Inc., 2012
CG 00 01 04 13

LIBERTY MUTUAL FIRE INSURANCE COMPANY

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

### COMPOSITE RATE ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
EXCESS COMMERCIAL GENERAL LIABILITY COVERAGE PART
GARAGE COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
MOTOR TRUCK CARGO COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRINTERS LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
SPECIAL PROTECTIVE AND HIGHWAY LIABILITY POLICY – NEW YORK
WAREHOUSEMEN'S LIABILITY COVERAGE PART

The composite rated premium for this policy shall be computed on the following basis:

| Rate | Rate Basis | Exposure Type |
|------|-----------|---------------|
| 15.191 | ☐ Per 1 | ☐ Sales (Including Foreign) |
| | ☐ Per 100 | ☐ Sales (Excluding Foreign) |
| | ☒ Per 1,000 | ☐ Square Feet |
| | | ☐ Workers Compensation Payroll |
| | | ☒ General Liability Payroll |

Exposure Types are defined as:

Sales (Including Foreign) means the gross amount charged by you, your concessionaires or by others trading under your name for all goods or products sold or distributed during the policy period, operations performed during the policy period and rentals both in the United States of America, its territories and possessions and outside the United States of America, its territories and possessions. Sales includes taxes, foreign exchange discounts, freight allowance to customers, total sales of consigned goods and warehouse receipts, trade or cash discounts, bad debts, and repossessions of items sold on installments.

Sales (Excluding Foreign) means the gross amount charged by you, your concessionaires or by others trading under your name for all goods or products sold or distributed during the policy period, operations performed during the policy period and rentals only in the United States of America, its territories and possessions. Sales includes taxes, foreign exchange discounts, freight allowance to customers, total sales of consigned goods and warehouse receipts, trade or cash discounts, bad debts, and repossessions of items sold on installments.

Square Feet means area, as measured in square feet, of all property you own, lease or rent, including land held for investment, during the policy period.

LC 99 24 03 06                                                                                   Page 1 of 2

254201400114100034

Workers Compensation Payroll means all payments by you in money, or in substitutes for money during the policy period to all executive officers and other employees for services rendered, subject to any over-time earnings, limitation of remuneration or exception rules applicable in accordance with the Workers Compensation manual in use by the Company.

General Liability Payroll means all payments by you in money, or in substitutes for money, during the policy period to all executive officers and other employees for services rendered, subject to any over-time earnings, limitation of remuneration or exception rules applicable in accordance with the General Liability manual in use by the Company.

COMMERCIAL GENERAL LIABILITY
CG 24 26 04 13

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# AMENDMENT OF INSURED CONTRACT DEFINITION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

The definition of "insured contract" in the Definitions section is replaced by the following:

"Insured contract" means:

a. A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

b. A sidetrack agreement;

c. Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

d. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

e. An elevator maintenance agreement;

f. That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization, provided the "bodily injury" or "property damage" is caused, in whole or in part, by you or by those acting on your behalf. However, such part of a contract or agreement shall only be considered an "insured contract" to the extent your assumption of the tort liability is permitted by law. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph f. does not include that part of any contract or agreement:

(1) That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

(2) That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

(a) Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

(b) Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

(3) Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in (2) above and supervisory, inspection, architectural or engineering activities.

Policy Number TB2-Z91-455039-034
Issued by Liberty Mutual Fire Insurance Co.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

## Personal and Advertising Injury Redefined - Definition of Publication

This endorsement modifies the insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
EXCESS COMMERCIAL GENERAL LIABILITY COVERAGE PART

Paragraphs d. and e. of the definition of "personal and advertising injury" are replaced by the following:

"Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

d.    Oral or written "publication" directly to the public at large of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services.

e.    (1)  Oral or written "publication" directly to the public at large of material that violates a person's right of privacy;

      (2)  Oral or written "publication" of material that violates a person's right of privacy by misappropriation of that person's name or likeness.

The following definition is added to the Definitions Section:

"Publication" means an insured's act of disseminating or broadcasting material or information.  Publication does not include the wrongful appropriation, interception or retrieval of material or information by a third party or the insured's dissemination or broadcasting of material or information to a person who is the subject of the material or the information.

LC 29 04 08 08                                                                                                  Page  1  of  1